## SILVERIO BORRELLI

### v.

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa January 19, 1897.*

1. JURORS—*names of jurors to fill panel must be drawn—challenge to array.* Jurors summoned from the body of the county by order of the court upon the discharge of the entire panel which had been drawn for the term, do not, under the statute, (Rev. Stat. 1874, p. 632, sec. 12,) constitute a legal panel for the trial of one indicted for murder, and such panel is subject to a challenge to the array, as not having been drawn as required by law.

2. SAME—*question of legality of panel must be raised by challenge to array.* The fact that the panel of jurors for the trial of one indicted for murder is not drawn in the manner provided by statute, (Rev. Stat. 1874, p. 631, sec. 8,) can be objected to only by a challenge to the array, and a simple objection to the jury does not raise the question of the legality of the panel, and is not sufficient.

3. SAME—*one challenging array must prove his allegations.* One challenging the array of jurors must stand ready to prove his challenge, and the better practice is to make such proof by affidavits.

4. APPEALS AND ERRORS—*conviction on insufficient evidence set aside on appeal.* The conviction of a defendant under an indictment for murder, upon evidence which sustains the defense that the killing was in fact done by another person, will be set aside on appeal.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. PHILIP STEIN, Judge, presiding.

W. S. ELLIOTT, Jr., for plaintiff in error.

MAURICE T. MOLONEY, Attorney General, (T. J. SCOFIELD and M. L. NEWELL, of counsel,) for the People.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

The plaintiff in error was indicted by the grand jury of Cook county for the murder of Dominick Parento, and at the April term, 1895, was tried, convicted and sentenced to be hanged. From that judgment this writ of error is sued out and various errors are assigned.

It appears a rencounter between the accused and the deceased occurred on Sunday night, November 25, 1894, which was not of a serious character but in which the accused received some slight bruises, which aroused in him a considerable degree of animosity and an apparent determination to have revenge. With this object in view he procured metallic knuckles, which he exhibited to several persons at different times when he was explaining how he came by the bruises and scratches, which he claimed he received at the hands of the deceased and of one Carmine Colantonio in the Sunday night rencounter. When displaying those metallic knuckles he declared an intention to use them in the next conflict, which the evidence shows he was determined to bring about, but no other weapon was exhibited or other threats made at those times. On the night of November 28, 1894, between eight and nine o'clock, the accused and deceased casually met in an open shed immediately west of and adjoining a saloon kept by one Volz, at the north-west corner of Sixty-ninth and Page streets, in the city of Chicago. A few feet to the west of the shed and upon the north side of Sixty-ninth street stands a two-story frame building, constituting the home of Dominick Parento and his family, in the rear of the upper story of which lived Carmine Colantonio and wife, witnesses in this case. About a half block northward from Sixty-ninth street, on the east side of Wood street, (which is one block west of Page street,) stands the house of Raphael Apata, at the beginning of this trial one of the co-defendants herein. At about the same distance northward, on the west side of Page street, stands the house of Silverio Borrelli, the defendant. On the north-east corner of Page and Sixty-ninth streets stands the saloon of one Navagato, within which, just prior to the time of the alleged homicide, the witnesses Antonio Papio and James Taglier are alleged to have been standing near the stove. To the northward of Navagato's saloon, upon the east side of Page street and

fronting to the west, across the alley from the premises
of Navagato, stands the barber shop of Frank Special,
another witness, in whose shop were congregated upon
the night of the homicide several congenial friends en-
gaged in social convivialities.   All of these parties, in
moving to and fro in the discharge of their social and
business relations, necessarily came to Sixty-ninth street
in going to and from their homes and to the saloons
and barber shop mentioned.   So far as developed by the
evidence, the only artificial light relied upon by the resi-
dents of the described locality was that furnished by the
city electric lamps located one each at Wood and Sixty-
ninth streets and Page and Sixty-ninth streets.   Each of
these lights is at least three hundred feet from the scene
of the homicide.   On meeting in this shed a conversation
commenced between the accused and the deceased, and
in a few moments the quarrel was renewed and a fight
commenced between them, in which the accused struck
the deceased several brutal blows in the face with his
hand wearing the metallic knuckles.   The deceased cried
out in a loud voice, which attracted the attention of vari-
ous persons, among others of Carmine Colantonio, who ran
towards the shed.   At about that time a pistol was fired,
the ball from which struck and killed Dominick Parento.
It is claimed by the prosecution that shot was fired by
the accused, whilst on the part of the defense it is urged
that Carmine Colantonio, a friend and god-son of the de-
ceased, fired the shot at the accused during the struggle,
but missed him and killed Parento.

    The testimony of Dr. Louis J. Mitchell, the coroner's
surgeon, who examined Parento's body, is, that there
was a wound on the nose and face of the deceased which
might have been made with metallic knuckles, and there
was a bullet wound below the left arm-pit and five inches
from and on a line with the nipple, and its track was
from left to right and slightly forward and upward.   The
bullet was taken from the body, and was of 38-caliber.

Tony Papio says that about five minutes before the deceased was shot he drank with him at Navagato's saloon, and shortly afterwards heard him calling for help, and he, Papio, ran out of Navagato's saloon and saw the accused at the south door of Volz' saloon, and Parento had his hands up to his face; that that was the first thing he saw when he got out of the saloon; that he ran west, and just as he got to the corner Borrelli shot and then threw the revolver away; that Parento was at the south-west corner of a water trough which was four or five feet from the saloon; that Parento stood with his knees against the trough when shot; that witness was twelve or fifteen feet distant when Parento was shot; that he did not see Apata, Colantonio or Mrs. Volz, or anybody; that Colantonio was stabbed after the shot, and came there first after the shooting. Witness says he followed Borrelli to Special's barber shop, where he charged him with the killing.

James Taglier testifies he was with and just behind Papio, and saw Borrelli shoot as soon as he (witness) got out from Navagato's saloon; that he saw no one but Borrelli and Parento, and they were punching each other's faces; that Parento's face was smashed up; that Parento was between the trough and saloon, facing north,—facing the door; that when shot he fell forward, got up, and then fell again; that he did not see Apata or Colantonio; that Borrelli threw the gun away after firing the shot.

Thomas J. Haughey testifies he left the Volz saloon with his son and heard quarreling in the shed; that he walked to Wood street, one block west of Page, when he turned around and saw the flash of a gun, and believes he saw three men; that when the shot was fired the men were within three or four feet of the shed; that he crossed Sixty-ninth street, went up on the south side of that street to Page, and crossed on Page and came to Volz' saloon, and saw Papio also going towards that saloon;

that he saw Colantonio in the saloon when he got to the place where Parento was lying on the walk.

Mrs. Louise Volz testifies that she was in the saloon and heard a shot; that she rushed to the door and saw Colantonio and Parento standing up and Borrelli lying down; that as she was in the door Borrelli sprang up and rushed into the house, pushing her aside and disappearing at the back part of the saloon.

William Schenkel, a son of Mrs. Volz, testifies to Borrelli rushing into the saloon just after his mother opened the door.

Raphael Apata testifies that he heard the quarreling between Borrelli and Parento and saw the blows struck; that he heard Parento halloo and saw Colantonio running toward him with a pistol in his hand; that he threatened to shoot the witness, who struck Colantonio with a knife on the shoulder blade and then started to run away; that when he got a short distance he heard a shot; that he passed on to his home and returned at once to Special's shop, where he saw the defendant, who said he was fighting with Parento when Colantonio came up and shot at him but hit Parento.

Borrelli, the accused, testifies that he was fighting with Parento, when Colantonio came up and snapped his gun at him two or three times before it was fired, and at the shot Parento cried out.

A 38-caliber revolver was found near the body of Parento, which contained one unexploded cartridge unmarked and unpunctured; one unexploded cartridge marked "C. C. C.," punctured; one empty shell marked "U. M. C.;" one empty shell marked "C. C. C.," and there was one empty chamber. Colantonio had borrowed of one James Snow a revolver, which was returned to him a day or two before this difficulty. Snow says all the chambers of his revolver were loaded when it was loaned as also when it was returned to him, and had not been fired. He got it at Colantonio's house, and when it was

handed to him Colantonio took another from a table and put it in his pocket, as Snow testifies. Snow's revolver was a 32-caliber, and he got the same from Colantonio between five and six o'clock on Monday morning. The night before, Mrs. Colantonio, desiring to attract the attention of the police, fired a revolver twice, which she testifies was Snow's. She also says she loaded it again from cartridges she had in the house. Colantonio says he loaded it after it was shot off by his wife. If Colantonio had another revolver than Snow's, as the latter testifies, then, if Mrs. Colantonio fired that one off instead of Snow's, and it was loaded as claimed, it might explain the different kinds of cartridges in the one found. It is apparent that the death of Parento resulted from a shot from the revolver found near his body.

From the evidence one cannot avoid the conclusion that Tony Papio and James Taglier did not see Borrelli fire the shot, because they say they came to the corner but did not see Colantonio and Apata, who fought at the Volz corner, between Navagato's saloon and the place where Borrelli and Parento were fighting. Mrs. Volz, who looked out of the saloon door and saw Borrelli and Parento and Colantonio, did not see either of them. Thomas J. Haughey saw Papio coming from Navagato's when he came from Wood street, a block west, and crossed to Volz' saloon. Papio and Taglier did not describe the location of Borrelli and Parento like any of the other witnesses. They place Borrelli with his left hand on the door of the saloon and Parento at the end of the trough with his hands to his face, facing northward, with Borrelli a little west of him. In this position the shot could not have been fired by Borrelli, as the bullet entered the left side, under the arm-pit, of the deceased. In addition to this, these witnesses are both impeached,—one by testimony impeaching his general reputation, the other by contradictory statements made out of court. Facts and circumstances detailed by other witnesses who were in

a position to see, contradict the testimony of these witnesses. Their evidence out of the case, and all that is left is the fact that Borrelli and Parento were fighting and the latter was shot. No other person pretends to say who did the shooting. Colantonio was near the men, as Mrs. Volz testifies. They were right close together right after the shot. Colantonio admits he was only a short distance away, and Haughey, when he saw the flash, saw three men or more. Colantonio seems to try to know a great deal about the case and yet to put himself in such relation that he could not have fired the shot. He says he heard Parento calling, and ran towards him. Apata testifies Colantonio had a gun and threatened to shoot him, and he struck Colantonio on the shoulder blade with a knife and then ran away, and the latter ran on towards Borrelli and Parento. Apata testifies that when he got twenty-five steps away he heard a shot. Immediately after the shot Mrs. Volz saw Colantonio there. Borrelli testifies he was there, and he himself admits he was near. Parento was his god-father and he lived in the house of the latter. He knew of the difficulty on Sunday night and of the threats that were made by Borrelli, and it could well be anticipated that he would go to the aid of Parento. Apata says Colantonio had a revolver, but he denies it. Snow says Colantonio had a revolver on Monday, and put it in his pocket when he, Snow, got his. No one saw Borrelli with a gun at any time, except as claimed by Papio and Taglier. No one claims the gun found near the deceased. It was a 38-caliber, and the bullet taken from the body of the deceased was a 38. Borrelli had metallic knuckels and showed them, and declared his purpose to use them, and did use them that night. Borrelli ran through the saloon, passed over to Special's barber shop, where he stated that Colantonio had tried to shoot him and hit Parento. He repeated it when Papio came in and charged him with the killing.

The above are the materials facts appearing in the record, and they, with the circumstances in the case, seem to corroborate the theory of the defense.

By this record, and the supplemental record filed by leave of court, it appears that at the term at which the defendant was tried a jury had been regularly drawn, which was discharged by the court. The court, by the act of discharging the entire panel, was left without any jurors selected in pursuance of the statute. Thereupon the court ordered a venire to issue to the sheriff, commanding him to summon fifty jurors from the body of the county. This venire was returned served, and in accordance therewith forty-four persons reported, were accepted, and ordered to be in attendance on the Criminal Court to constitute the full panel of petit jurors. No other jurors were in attendance on the court.

Section 12 of "An act concerning jurors, and to repeal certain acts therein named," in force February 11, 1874, provides as follows: "The judge shall examine the jurors who appear, and if more than twenty-four petit jurors who are qualified and not subject to any exemption or any of the disqualifications provided in this act shall appear and remain after all excuses are allowed, the court shall discharge, by lot, the number in excess of twenty-four. If for any reason the panel of petit jurors shall not be full at the opening of such court or at any time during the term, the clerk of such court may again repair to the office of the county clerk and draw, in the same manner as at the first drawing, such number of jurors as the court shall direct, to fill such panel, who shall be summoned in the same manner as the others, and, if necessary, jurors may continue to be so drawn and summoned, from time to time, until the panel shall be filled."

The regular panel of jurors having been discharged and no regular panel being in attendance on the court, instead of issuing a venire to the sheriff commanding him

to summon fifty jurors from the body of the county the court should have ordered the clerk to draw from the box containing the list of jurors in the county clerk's office, in accordance with the above provision of the statute. In *Gropp* v. *People*, 67 Ill. 154, where a similar statute having reference to the jury in civil cases was before this court for construction with reference to organizing a panel of jurors, we said (p. 155): "Under the act concerning jurors, of April 10, 1872, which was in force at the time of this trial, the panel of jurors was irregularly filled. Instead of the court ordering the sheriff to summon a sufficient number to fill the panel, the clerk of the circuit court should have drawn from the box in the county clerk's office containing the list of persons * * * summoned by the sheriff. Were this a civil cause, no doubt it would have been a good cause of challenge that the panel of jurors was so constituted in violation of this act." The same act was again before this court for construction in *Lincoln* v. *Stowell*, 73 Ill. 246, and it was there said (p. 248): "Had there been no provision in the statute for obtaining a jury, when, at the same time, the court was required to be held until the business was disposed of, perhaps recourse might have been had to the common law power of the court for the purpose of obtaining a jury, as was done in *Stone* v. *People*, 2 Scam. 326. But in this case no such difficulty had arisen. A mode was provided by the statute by which a jury could be obtained. Under section 13 it is provided, if for any reason the panel shall not be full at the opening of the court or at any time during the term, the clerk of the court shall again repair to the office of the county clerk and draw in the same manner as the first drawing, who shall be summoned, etc. Under this section, if none of the jurors first drawn and served should appear at the beginning of the term, it would no doubt be proper to have a full panel drawn and served in like manner. If, during the term, there should be no jury present, for the reason

that the time for which they were selected had expired, or other cause, an entire panel could be drawn and then summoned in the mode pointed out in the statute. When, therefore, the court saw a jury would be necessary for the trial of causes for the fourth week of the term, the clerk should have drawn in the manner provided in the statute. This not having been done, but a jury having been selected by the sheriff from the county, the challenge to the array interposed by the defendant was proper, the overruling of which was error for which the judgment will have to be reversed."

The provisions of the act of 1872 and the act of 1874, in reference to the manner of summoning the regular panel, are substantially alike. The act of 1874 applies to both civil and criminal cases, whilst the act of 1872 was by its terms applicable to civil cases only. The act of 1874 was before this court for construction in *Siebert* v. *People*, 143 Ill. 571, and it was there said, with reference to the language of section 12 of the act (p. 577): "It seems to be plain from the language of the section of the statute relied upon, if for any reason, during the term of court, the panel of jurors shall not be full, the clerk of the court may draw such number of jurors as the court may direct, to fill the panel, and the jurors so drawn are required to be summoned by the sheriff."

When the counsel for defendant in this case asked for a list of the panel of jurors he was handed a list of forty-four jurors who had not been selected in pursuance of the statute and which constituted no panel known to the law. By the express provisions of the statute a full panel consists of twenty-four jurors. The defendant objected to the jury, and was ordered to proceed with the selection of a jury from the list so furnished. In the motion for a new trial the manner of selecting the jury is assigned as one of the causes for a new trial, and the defendant filed numerous affidavits going to show he was prejudiced injuriously from this cause. Two of these affi-

davits are to the effect that affiants do not believe a person of Italian extraction, at the hands of a jury chosen in whole or in part from citizens having their places of business on South Water street, in the city of Chicago, could have a fair trial. One of these affiants states that he has been engaged in the commission business on South Water street, in said city, continuously for the past twenty years; that he now has his place of business at No. 127 South Water street; that he knows the people doing business on that and neighboring streets in said city, and is well informed as to their estimation of persons of Italian birth in general, from his long association with them and from the many opinions which he has heard expressed by numberless persons doing business on South Water street of said Italian people; that from his said means of knowledge and information he knows that there is a deep-seated prejudice existing among said business men against the average person of Italian extraction; that judging from his said knowledge of such prejudice and the universality of its existence, as observed by him, he does not believe that a prisoner of Italian birth could receive a fair and impartial trial at the hands of a jury composed of citizens drawn wholly or largely from among the men doing business on said South Water street.

Forty-seven persons were examined from whom to obtain a jury. Of these, eight were residents of South Water street. The residence of sixteen of those examined is not stated. It is apparent that the manner of selecting a jury was not in pursuance of the statute, and the fact that, notwithstanding the vast population of Cook county, more than one-sixth of those examined were from the very locality where there was a prejudice against men of the nationality of the defendant, is sufficiently indicative that the manner of selection was to the prejudice of defendant. But while the jury were not empaneled in accordance with the statute, we have fre-

quently held that the only manner in which the legality of the panel can be raised is by a challenge to the array. The only manner in which the legality of the panel was here challenged was by an objection to the jury, which was overruled. This did not raise the question. Where a challenge to the array is made, the challenger must stand ready to prove his challenge by proof of the illegality of the panel. This proof may be made by oral evidence or by affidavits. The better practice is to make the proof by affidavits. In this manner the question as to the sufficiency of the panel can be determined. It can not be by an objection to the jury.

From the evidence in this record we are constrained to hold a new trial should have been awarded. The judgment of the Criminal Court of Cook county is therefore reversed and the cause remanded for a new trial.

*Reversed and remanded.*