**People of the State of Illinois, Plaintiff-Appellee, v. Kenneth Cunningham (Impleaded), Defendant-Appellant.**

**Gen. No. 51,723.**

First District, Second Division.

April 7, 1970.

James L. Coghlan, Coghlan and Joyce, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Francis X. Riley, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE LYONS delivered the opinion of the court.

In a two-count indictment, the defendant, Kenneth Cunningham, age eighteen, and three other youths, William McAvoy, Phillip Spagnola and John Ligue were jointly charged with murder in violation of Ill Rev Stats (1963), c 38, § 9–1(a)(1) or (a)(2). McAvoy's motion for a severance was granted and he received a separate trial. He did not testify in the instant case and this record is silent as to the ultimate disposition of his case. The three other coindictees, Cunningham, Spagnola and Ligue were jointly tried by a jury, were convicted of murder and judgments were entered. Spagnola and Ligue have appealed from these adverse judgments along with others against them which judgments we today affirmed. See People v. Spagnola (Impleaded) and Ligue (Impleaded), 123 Ill App2d 171, — NE2d —. After judgment was entered against Cunningham for murder and

his written post-trial motion for a new trial was denied, he was sentenced to 20–40 years in the State Penitentiary. In this appeal, he does not question the sufficiency of the evidence but maintains that he did not receive a fair trial due to five trial errors.

Specifically, he contends that: (1) he was denied the right to be tried by a fair and impartial jury due to prejudicial pretrial newspaper publicity informing the venire that twelve of their fellow jurors had been excused from jury service by a judge, not the jurist who presided at the instant case however, because they had returned a not guilty verdict with which the judge publicly disagreed; (2) the trial court erred in denying the defendant's motion for a mistrial when the widow of the deceased ran screaming from the courtroom during the testimony of the State's life and death witness and also when the jury commingled with relatives of the deceased and other veniremen; (3) the prosecution deliberately prejudiced the defendant by informing the jury of a prior statement made by a State's witness and by commenting on this statement to the jury in closing argument; (4) the trial court's refusal to give the defendant's tendered voluntary and involuntary manslaughter instructions was reversible error; and (5) the court erred in submitting a flight instruction to the jury which prejudiced the defendant since the prosecution presented no evidence that he attempted to flee from the scene of the crime.

On January 24, 1966, prior to the commencement of the voir dire examination in the instant case, the attorney for Cunningham presented to the court a written "Challenge to the Array of Jurors and Motion for (30) Day Continuance" which was signed by the defendant Cunningham, supported by his affidavit, and had attached to it as exhibits, three newspaper articles which had appeared in the Chicago press. The Challenge alleged

that on the preceding Monday, January 17, 1966, a judge sitting in the Cook County Criminal Court Building (not the trial judge sitting in the instant case, however) had publicly criticized, discharged and dismissed from future jury service twelve jurors who had returned a not guilty verdict. The Challenge went on to state that these twelve jurors were part of the same venire from which the defendant's jury would be selected; that the jurors were discharged because the judge thought a conviction should have been returned and not an acquittal; that these jurors returned to the Criminal Court Building the next morning but were sent home; that these facts had been given publicity by the Chicago newspapers on Wednesday and Thursday, January 18 and 19, 1966; and that as a result of the foregoing factors, the venire was not lawfully constituted and a fair and impartial jury could not be selected from this venire. The Challenge concluded with a prayer that the trial be continued for thirty days so that the defendants could select a jury from a new venire. After hearing argument, the court denied the Challenge to the Array and Motion for a Continuance but informed the three defense counsel that each of them would be permitted the widest of latitude in the ensuing voir dire examination so that each could determine to his satisfaction whether the veniremen knew of this incident and the extent, if any, to which they were influenced by it. The trial court later refused to excuse such prospective jurors for cause, requiring the defendants to use their peremptory challenges. The record reveals that the defendants, Cunningham, Spagnola and Ligue, and the State were each allowed a total of sixty (60) peremptory challenges.

■ ■ We doubt if this issue was properly brought to the trial court's attention by virtue of a Challenge to the Array. We recognize that defendant's counsel alleged in his motion that the venire was not lawfully

constituted due to the dismissal of twelve jurors from future jury service, but such dismissal occurred subsequent to the selection of the array. A challenge to the array goes to the form and manner of selecting the venire and relates to the legality of selecting, summoning, or impaneling the venire or array. Bruen v. People, 206 Ill 417, 423–24, 69 NE 24 (1903); Borrelli v. People, 164 Ill 549, 558–60, 45 NE 1024 (1897). It will only be allowed upon some ground affecting the validity of the whole array growing out of the proceedings in selecting and summoning the jurors composing the array. United States v. Gordon, 253 F2d 177, 184–85 (CA 7th Cir 1958). In the instant case, the defendant's Challenge raised no question as to the drawing, selecting, or impaneling of the array. However, because the State did not object to the Challenge but answered it on its merits, we shall do the same.

■■ In our opinion, the trial court handled this delicate matter in a proper manner. The remedy was not to impose a thirty day continuance but rather was to expand the voir dire examination so as to determine the effect of the pretrial publicity on the prospective jurors. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Irvin v. Dowd, 366 US 717, 723 (1961); People v. Williams, 40 Ill2d 522, 531–32, 240 NE2d 645 (1968). Furthermore, the examination of prospective jurors is, in a typical instance of pretrial publicity, probably the most valuable means of ascertaining partiality or indifference among the array. People v. Kurtz, 37 Ill2d 103, 108, 224 NE2d 817 (1967). We do not think that the incident alluded to in the Challenge which involved twelve other jurors and another trial court judge in an unrelated case must lead to the presumption, as a matter of law, that all other veniremen in the array no longer could be fair and impartial to the defendant.

The voir dire examination is included in the record before us. The examination of prospective jurors took approximately three days and the trial of the case on the ultimate issues took a like period of time. During the voir dire examination, the trial court informed the prospective jurors on four separate occasions that it had the practice, which it intended to continue, of never commenting on the verdict of the jury. Approximately ninety prospective jurors were examined and the majority of those who were asked the question stated that they had read, in the jury assembly room, the newspaper articles earlier alluded to, but most of them said they were not influenced by it and would continue to follow the dictates of their own conscience. The defendants used their peremptory challenges on those veniremen having a contrary attitude. When twelve jurors were acceptable to both sides and were sworn, the court had excused nineteen prospective jurors for cause and the State had used thirteen of its peremptory challenges whereas the defense had used forty-one. Although the defendants contend that the court erred in refusing their challenge for cause as to all jurors who had read the newspaper articles, they were not prejudiced by this ruling as they had nineteen peremptory challenges remaining at the time the jury was sworn.

We have carefully examined the seven hundred twenty-two page transcript of the voir dire examination presented to us and note that all the prospective jurors who ultimately made up the final panel of twelve and who were asked the question stated that what another judge did in an unrelated case and the newspaper publicity given it would not affect their deliberations in the instant case and that it would not be necessary to convict these defendants in order to avoid criticism from the judge presiding at this trial. The judge presiding at the instant case informed the prospective jurors on

four separate occasions that he intended to continue his practice of never commenting on the verdict returned by the jury. Some of the twelve jurors acceptable to both sides, including the foreman of the jury, stated that they thought the other judge was incorrect in criticizing the other jury for doing their duty.

■ ■ It is also to be noted that when the jury was sworn, the defendants had nineteen unused peremptory challenges. This too indicates that the attorneys for the defendants were of the opinion that these twelve jurors represented a fair and impartial trier of the facts. People v. Sleezer, 9 Ill2d 57, 60–61, 136 NE2d 808 (1956); People v. Williams, 40 Ill2d 522, 531–32, 240 NE2d 645 (1968); People v. Speck, 41 Ill2d 177, 184, 242 NE2d 208 (1968). Counsel for the defendant states that he did not use the remaining peremptory challenges because he did not want to antagonize the trial court. However, the voir dire record does not indicate that the trial court ever became impatient with the defendants but rather it is evident to use that he, in fact, did allow an exhaustive voir dire examination so as to protect the rights of the defendants. Furthermore, the trial court had said earlier that the defendants had the right to exercise all of their sixty peremptory challenges. His subsequent attitude never wavered from this position.

The defendant's reliance upon People v. Schraeberg, 347 Ill 392, 179 NE 829 (1932), in support of his contention that he did not have to exhaust all his peremptory challenges in order to preserve the point for appeal purposes is misplaced. In that case, the reviewing court held that since the defendant's Challenge to the Array should have been sustained in the trial court because of an irregularity in the selection of the array, it became unnecessary for him to exercise all of his peremptory challenges in order to preserve the point. We have stated earlier in this opinion, however, that the defendant's

Challenge to the Array was properly denied by the trial court in the instant case. Therefore, when the defendants accepted twelve jurors, although nineteen peremptory challenges were still available for their use, we can reasonably assume that their attorneys were of the opinion that the jury was fair and impartial.

The other cases relied upon by the defendant are not persuasive. In both Irvin v. Dowd, 366 US 717 (1961) and Rideau v. Louisiana, 373 US 723 (1963), two murder cases, it was held that the defendant's motion for change of venue should have been granted because of cooperation between the police or prosecution and the news media which made it constitutionally impossible to select an impartial jury. In Irvin, the prosecutor and police issued press releases, which were intensively publicized by the news media, stating that the defendant had confessed to the six murders committed in their community whereas in Rideau, a twenty minute "interview" between the defendant and the sheriff of the parish was held in a jail and put on film with accompanying sound track. This "interview" consisted of interrogation by the sheriff and admissions by the defendant that he had committed the armed robbery, kidnapping, and murder which had occurred the day before. The "interview" was shown on local television for three consecutive days. In both Irvin and Rideau, defense counsel had exhausted peremptory challenges and unsuccessfully attempted to excuse for cause prospective jurors who had read the news releases or had seen the televised "interview."

Eight of the twelve jurors in Irvin admitted, before hearing any testimony, that they thought the defendant to be guilty of murder although they did say they could be fair and impartial to him. The reviewing court held this response showed actual prejudice to the defendant and that his 14th Amendment due process rights were violated whereas in Rideau, the court held that identi-

fiable prejudice did not have to be shown in that case since the "interview" televised in the community on three separate occasions was in reality the defendant's trial at which he pleaded guilty. The subsequent jury trial was but a hollow formality. In two other cases relied upon by the defendant, Estes v. Texas, 381 US 532 (1965) and Sheppard v. Maxwell, 384 US 333 (1966), it was held that identifiable or actual prejudice in violation of due process rights did not have to be shown by the defendant because the procedures employed by the State, live television coverage of the court proceedings in Estes and massive pretrial newspaper coverage in Sheppard, involved such a probability of resulting prejudice that the trial itself was deemed inherently lacking in due process. The factual setting of the instant case in no way approaches that found in the cited cases however.

■ After carefully reading the other cases relied upon by the defendant, People v. Murawski, 394 Ill 236, 68 NE2d 272 (1946); People v. Hryciuk, 5 Ill2d 176, 125 NE2d 61 (1955); People v. Cain, 36 Ill2d 589, 224 NE2d 786 (1967); McLendon v. United States, 2 F2d 660 (CCA 6th Cir 1924); and Boyles v. United States, 295 F 126 (CCA 6th Cir 1924), we conclude that they too are factually distinguishable from the instant case. We adhere to our opinion that this record shows that the defendants were tried by a fair and impartial jury.

■ Secondly, the defendant urges that the trial court erred in denying the defendant's motion for a mistrial when the widow of the deceased ran screaming from the courtroom during the testimony of the State's life and death witness and also when the jury commingled with other veniremen and relatives of the deceased. The defendant was tried jointly with Spagnola and Ligue. In People v. Spagnola (Impleaded) and Ligue (Impleaded), 123 Ill App2d 171, — NE2d —, filed today, we held that the trial court, by its immediate affirmative response to the widow's emotional outburst coupled with its later

cautionary instruction given to the jury in writing, protected the defendants' right to be tried by a dispassionate and impartial jury. The alleged commingling of the jury, however, raises an issue which was not presented in the companion case of People v. Spagnola and Ligue.

On the last day of the trial, the defense attorneys brought two things to the attention of the trial court at the noon recess as the basis for their motions for a mistrial. One defense lawyer said he had heard some conversation in the corridor a few minutes earlier between the twelve jurors and some of the women who had been prospective jurors as the twelve jurors were leaving for lunch. He could not determine what was said, however. Another defense attorney later said he had been informed that when the jury returned from lunch and were leaving the elevator on their way back to the courtroom, they were met at the elevator by the decedent's sister, two brothers, and someone else connected with the family who were standing in front of the jury elevator. The attorney received this information from the family of one of the defendants, but they did not know if a conversation ensued or if these people stationed themselves deliberately at this position.

As to the first incident of commingling, the court questioned, in chambers, the two bailiffs who had escorted the jurors to lunch and learned that only a brief social conversation had occurred as two women nonjurors had said to two women jurors: "Call me tonight" and "It was nice knowing you." Nothing further was said. The court denied these motions for mistrial and this is alleged as error.

██ ██ We find no error here. As a result of the court's examination of the bailiffs, it was learned that only a brief social conversation occurred between two

women jurors and some of the women who had gathered in the corridor that afternoon. The merits of this case were not discussed. The jury returned its verdict of guilty before leaving that evening. The defendant was not prejudiced by this social conversation. As to the meeting between the relatives of the deceased and the twelve jurors, there was no showing that this was deliberately planned. It is just as reasonable to assume that it happened accidentally since this was a public trial and the relatives of both the deceased, except his widow, and the defendants were in the building that day. The motions for mistrial were properly denied.

The defendant also contends that reversible error occurred when the prosecutor informed the jury of a prior statement, not in evidence, made by a State's witness and when he later commented on it in closing argument. The record reveals that after the court had recessed for the evening, one of the defense attorneys asked the prosecutor for a statement made by a State's witness to the police soon after the murder had occurred. This request was made out of the presence of the jury and immediately after the witness had completed his testimony on direct examination. The next morning the defense attorney, again out of the presence of the jury, informed the court that he had not received a copy of the report from the prosecutor. The State's Attorney replied that the evening before he had furnished the only copy to the other defense attorney. Sharp words were then exchanged between the prosecutor and the defense attorney who had sought the statement but had not yet received a copy. The court allowed him fifteen minutes to read the document. The jury was then brought in and the prosecutor said: "Your honor, I'd like the record to show at this time that we have furnished all three defense counsel with a copy of the statement made to the police by witness Norred on February 20,

1965." Defense counsel objected to the prosecutor making this statement in the presence of the jury and stated that he had received his copy only fifteen minutes earlier. The objection was overruled as the court said it had recessed for fifteen minutes thereby giving defense counsel time to read the statement. The witness, Norred, was not cross-examined as to the contents of his written statement.

In closing rebuttal argument, the prosecutor stated that the defense lawyers had unsuccessfully attempted to contradict the witness, Norred. Continuing, the prosecutor said: "The defense lawyers were furnished, as you saw here in the courtroom, with his complete written statement to the police which he made immediately after this incident. They did not cross-examine him on it." The defense lawyers objected to this remark on the grounds that the prosecutor was attempting to create an inference before the jury that the written statement, which was not in evidence, contained some matter damaging to the defense since the witness, Norred, was not cross-examined concerning it. The court sustained the objection and instructed the jury to disregard any references made to the statement given by Norred to the police. Later, a written instruction was given to the jury informing them that they were to disregard any argument or statement made by opposing counsel not based on the evidence and if they had heard any evidence in the case which the court afterwards struck out, they were to wholly disregard it in arriving at their verdict.

 Although we do not approve of the prosecutor's conduct in delivering this written statement to the defense attorneys in the presence of the jury and in later attempting to comment upon it in closing argument to the jury, having held such conduct to be reversible error in two prior cases [People v. Beard, 67 Ill App2d 83, 214 NE2d 577 (1966) ; People v. Lowe, 84 Ill App2d

204

435, 228 NE2d 563 (1967)], we are of the opinion that in the case at bar, this conduct did not result in reversible error. When the prosecutor said he was now tendering the written statement of the witness to all three defense counsel, the jury was diverted from the impropriety of this remark since defense counsel objected saying he had received his copy only fifteen minutes earlier and the court replied that it had been in recess so that the statement could be read by the defense. The subject was not mentioned again until the prosecutor attempted, in closing rebuttal argument, to comment upon the written statement. The court sustained the objection and immediately informed the jury to disregard any references to Norred's police statement. A later written jury instruction reminded the jury to disregard such matters in arriving at their verdict. In our opinion, the actions of the trial court resulted in keeping this record free from reversible error. People v. Murray, 307 Ill 343, 138 NE 681 (1923); People v. Lion, 10 Ill2d 208, 216, 139 NE2d 757 (1957). Furthermore, the evidence in the instant case so strongly supports the verdict that we cannot say the jury was influenced by the prosecutor's conduct.

The defendant also urges that the trial court committed reversible error in refusing to give to the jury the defendant's tendered instructions on voluntary and involuntary manslaughter. This contention requires a brief summary of the evidence. The facts are set out in detail in the companion case of People v. Spagnola and Ligue, 123 Ill App2d 171, — NE2d —, filed today. Only a brief summary of the facts will be given here.

The State presented evidence that the defendant, Cunningham, struck the decedent, Jack Naylor, a downward blow on the left side of the head while holding the smaller, narrower end of a pool cue stick in both hands and swinging the pool cue like a baseball bat. The dece-

dent, a patron in the tavern where the homicide occurred, was unarmed and was sitting at the bar when struck. It was stipulated that the cause of his death was internal bleeding. The blow was struck at approximately 12:15 a. m. on February 20, 1965.

Other evidence presented by the State showed that Spagnola and Ligue were holding weapons on the other patrons at this time and that Spagnola, Ligue, Cunningham, and another youth had come back to the tavern approximately forty-five minutes after Ligue had vowed to return. Earlier, an argument had ensued in the bar between the bartender and Ligue's father when the bartender refused to serve him. Ligue's son promised to return so as "to get" the bartender and "clean up" the place. After taking Mr. Ligue home, the four youths returned to the tavern, but only after arming themselves with two weapons, a revolver and an automatic. Spagnola and Ligue entered first with weapons drawn and told everyone to get on the floor. The homicide and other beatings, including that of the bartender, ensued soon thereafter. Witnesses for the State testified that there was no melee in the tavern when the youths returned with weapons but rather the patrons complied with any orders given them. When the telephone rang, the four youths left the tavern together. Thereafter, a patron went to the decedent but was unable to hear a heart or pulse beat. A police officer stated that he saw defendant Cunningham brought into the police station about four hours after the trouble in the tavern had occurred.

Mrs. Cunningham testified for the defense and said that when she saw her son at 11:00 p. m. on February 19, 1965, he was staggering, glassy-eyed and intoxicated but would not go to bed as she wanted. She did not see him again until 8:15 a. m. on February 20, 1965, at the police station. In her opinion, when she saw her

206

son at 11:00 p. m., he did not have the ability to think and reason because of his intoxication.

The only occurrence witness to testify for the defense was Phillip Spagnola, one of the defendants. He stated that he and Ligue had been drinking since 11:00 a. m. on February 19, 1965, and that Cunningham joined them at 6:30 p. m. with whiskey and more beer. He went on to say that when they went to the tavern at 11:30 p. m. everyone was drunk and Cunningham was very drunk. They returned to the tavern at 12:15 a. m. on February 20, 1965. He denied that he and Ligue entered with drawn weapons but stated that he heard some unidentified patron yell, "They're back" and "Watch it" whereupon some person, unidentified, swung a pool cue striking defendant Cunningham across the back or shoulders. A "big fight" then began. Spagnola stated that he never saw what Cunningham did in the rear of the tavern after the alleged melee began.

In support of his contention that the voluntary manslaughter instruction should have been given, the defendant relies upon a specific subsection of the voluntary manslaughter statute in Illinois, Ill Rev Stats (1963), c 38, § 9–2(a), which states that a person commits voluntary manslaughter if, at the time of the killing, he is acting under a sudden and intense passion resulting from serious provocation by: (1) the individual killed, or (2) another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

In People v. Wax, 75 Ill App2d 163, 183, 220 NE2d 600 (1966), it was held that numerous quarrels only between the defendant and his wife concerning his wife's paramour were not sufficient provocation to reduce the homicide from murder to voluntary manslaughter when the husband subsequently killed the paramour. The reviewing court concluded that the voluntary manslaughter in-

struction tendered by the defendant was properly refused since the passion engendered by the conduct of persons other than the decedent (i. e., the arguments between the defendant and his wife to which the paramour was not a party) could not be made into provocation within the language of the voluntary manslaughter statute in Illinois.

■ In the instant case, the State's witnesses, most of whom were patrons in the tavern when the homicide occurred, testified that there was no melee when the youths returned with drawn weapons. The only evidence of an affray in the tavern came from Spagnola, one of the joint defendants and the only defendant who chose to testify. It is to be noted that Spagnola did not state that the decedent struck the defendant across the back or shoulders with a pool cue. Nor was it his testimony that some other identified person so struck the defendant, and in attempting to kill that person, the defendant negligently or accidentally struck the decedent. Spagnola only stated that some unidentified patron allegedly struck Cunningham across the shoulders provoking a melee and causing Spagnola and Ligue to draw their weapons at that time. He went on to say that he never saw what Cunningham did at the rear of the bar after the affray began. In our opinion, the voluntary manslaughter instruction offered in the language of the statute and tendered by the defendant was properly rejected because there was no evidence in the record which, if believed by the jury, would support a voluntary manslaughter verdict.

■ ■ As to involuntary manslaughter, the defendant relies upon the evidence of his voluntary intoxication. He did tender an involuntary manslaughter instruction in the language of the statute, Ill Rev Stats (1963), c 38, § 9-3(a), which was refused by the court. In our opinion the court acted properly here. Voluntary in-

208

toxication is an affirmative defense if it negatives the existence of a mental state which is an element of the offense. Ill Rev Stats (1963), c 38, § 6-3(a). In a line of cases in this jurisdiction beginning apparently with People v. Cochran, 313 Ill 508, 145 NE 207 (1924), and continuing through People v. Tanthorey, 404 Ill 520, 89 NE2d 403 (1950); People v. Brown, 415 Ill 23, 112 NE 2d 122 (1953); People v. Strader, 23 Ill2d 13, 177 NE2d 126 (1961); and People v. Hicks, 35 Ill2d 390, 220 NE 2d 461 (1966); reviewing courts have held that where voluntary intoxication is so extreme as to suspend entirely the power of reasoning, the defendant cannot be convicted of murder since he is incapable, due to his voluntary drunkenness, of forming an intent to kill. In other words, he is incapable of killing with malice, express or implied, which is required to support a murder conviction.

██ ██ This voluntary intoxication does not result in the acquittal of the defendant however. He could be convicted of voluntary manslaughter which requires neither a specific intent nor malice. These judicial holdings are a humane manifestation of the common law which recognizes man's human frailties. We therefore are of the opinion that although voluntary intoxication, in a proper case, might reduce the degree of homicide from murder to voluntary manslaughter so that a defendant's voluntary manslaughter instruction must be given to the jury, it does not reduce it one degree lower to involuntary manslaughter.

██ ██ In addition, involuntary manslaughter is not a specific intent crime but rather involves the general criminal intent of recklessness. See Ill Rev Stats (1963), c 38, § 9-3(a) and § 4-6. IPI—Criminal, § 24.02, p 415 states that voluntary intoxication is not a defense where the mental state involved is recklessness. Since voluntary intoxication is not an affirmative defense to the

209

charge of involuntary manslaughter, it cannot be used to reduce the degree of homicide from murder to involuntary manslaughter. We therefore hold that the trial court did not err in refusing to instruct the jury as to involuntary manslaughter.

 Finally, the defendant urges the court erred in submitting a flight instruction to the jury which prejudiced him since there was no evidence that he attempted to flee the scene of the crime with a consciousness of guilt and for the purpose of evading arrest. This contention was not included in the defendant's written post-trial motion and is considered waived for appeal purposes. People v. Irwin, 32 Ill2d 441, 207 NE 2d 76 (1965); People v. Gratton, 28 Ill2d 450, 192 NE2d 903 (1963). Nevertheless, we have considered the point and find it to be without merit. The defendant and three other youths entered the tavern together and left together after the telephone rang and after a homicide and other beatings had occurred in the tavern. The State's evidence, if believed, showed the youths, including this defendant, to be active participants in these offenses. This evidence supports a reasonable inference that they all left the scene of the crimes in an attempt to evade arrest. The flight instruction was properly given as to all the defendants at their joint trial.

 We have carefully reviewed the record in this case and are of the opinion that the defendant received a fair trial and was convicted of murder beyond a reasonable doubt. The judgment is affirmed.

Judgment affirmed.

McCORMICK, P. J. and BURKE, J., concur.