THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ANDREW BURDINE *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 77-363, 77-364 cons.

Opinion filed February 17, 1978.—Rehearing denied March 21, 1978.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant Andrew Burdine.

James Geis and Kathy Morris, both of State Appellate Defender's Office, of Chicago, for appellant Jerrico Smalley.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Joan S. Cherry, and Pamela L. Gray, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendants were found guilty of attempt murder, armed robbery, and aggravated battery. Judgments were entered merging the aggravated battery and attempt murder convictions, and each defendant was sentenced to 60-100 years. The appeals of the defendants were consolidated for review, and they jointly contend that the jury was erroneously instructed regarding the elements of attempt murder; that they were not proved guilty of attempt murder beyond a reasonable doubt; and that prosecutorial misconduct concerning certain police reports denied them a fair trial. Additionally, Burdine contends that the trial court erred in sending certain photographs, not admitted in evidence, to the jury. Smalley also separately contends that his sentence was excessive and that he was denied a fair trial (a) because of the admission of evidence of prior criminal activity; and (b) because the prosecutor's closing argument vouched for the credibility of State's witnesses.

It appears that the Checker Taxi Co. received a request for a cab by a person identifying himself as "Berdeen." Willie McDougle, a Checker driver, was told to respond and arrived at the address given shortly before 5 a.m. Two men, whom he identified as defendants, entered the cab, and when their announced designation was reached Smalley paid the fare, using a special push-through cup because a protective shield between the front and back seats was closed, preventing direct contact. After McDougle used the cup to deliver the change, Smalley (who had left the cab) opened the right front door and announced a holdup. He then slid the protective shield to an open position through which Burdine aimed a sawed-off shotgun at McDougle and threatened to blow his head off. He was told to drive his cab into a nearby alley, where on demand he gave up the cab money and some of his own. At this point, Smalley searched and took more money from him, after which he demanded his gun. When McDougle said he had no gun, Smalley struck him with his fist and, on several occasions thereafter, Burdine hit him on the side of his head with the shotgun, causing some of his teeth to chip. Smalley then stripped him of his clothing and Burdine walked him away from the cab towards a garage, where he told him not to turn around. He did turn, however, and saw Burdine fire the gun at him. Defendants fled immediately, but McDougle, who had been shot in the left thigh, managed to crawl back to his cab where he sounded his horn. The police arrived within 25-30 minutes and transported him to the hospital, where later his left leg was amputated above the knee.

Police officers who arrived at the scene testified that the victim had a

gaping wound in his left thigh, through which they could see bone and muscle and from which there was considerable blood.

Dr. Flaherty, the surgeon who operated on McDougle, testified that the shotgun blast had blown away considerable muscle tissue in the area of the four- to five-inch wound; that the popliteal and femoral veins, the femoral artery and the sciatic nerve had been severed; that it was difficult to examine the wound, as it filled with blood whenever the pressure bandage was removed; and that during the operation, the leg had to be clamped above and below the knee to control bleeding. During the attempt to repair his leg, McDougle went into shock twice and, eventually, the decision to amputate was made.

OPINION

Defendants first contend that the trial court erroneously instructed the jury regarding the elements of attempt murder. Initially, we note that defendants' failure to object to the attempt murder instructions is a waiver of their right to raise the question on review (*People v. Hines* (1964), 30 Ill. 2d 152, 195 N.E.2d 712); however, as provided in Supreme Court Rule 451(c) (Ill. Rev. Stat. 1973, ch. 110A, par. 451(c)), we believe that the interests of justice require its review here.

The pertinent instructions were as follows:

> "A person commits the crime of attempt who, with intent to commit the crime of murder, does any act which constitutes a substantial step toward the commission of the crime of murder." (Illinois Pattern Jury Instructions, Criminal, No. 6.05 (1968) (hereinafter cited as IPI Criminal).)[1]

> "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death,

>> he intends to kill or *do great bodily harm* to that individual; or he knows that such acts will cause death to that individual; or he knows that such acts create a strong probability of death *or great bodily harm* to that individual * * *." (IPI Criminal No. 7.01 (emphasis added).)

> "To sustain the charge of attempt, the State must prove the following propositions:

> *First*: That the defendant performed an act which constituted a substantial step toward the commission of the crime of Murder; and

> *Second*: That the defendant did so with intent to commit the crime of Murder.

> If you find from your consideration of all the evidence that each

---

[1] The felony murder subparagraph was omitted.

of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty." IPI Criminal No. 6.07.

It is defendants' position that it was error not to delete the underlined phrase in No. 7.01, because it permitted the jury to return a verdict of guilty of attempt murder on an intent only to do great bodily harm.

■■ Ordinarily, the trial court has no obligation to instruct on its own motion; however, in criminal cases, due process places such a burden on the court regarding the elements of the crime charged. (*People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487; *People v. Lewis* (1969), 112 Ill. App. 2d 1, 250 N.E.3d 812.) Moreover, where the crime charged is attempt, the court must not only relate the elements of attempt itself but also of the specific offense allegedly attempted. *People v. Viser* (1975), 62 Ill. 2d 568, 343 N.E.2d 903; *People v. Koshiol* (1970), 45 Ill. 2d 573, 262 N.E.2d 446, *cert. denied* (1971), 401 U.S. 978, 28 L. Ed. 2d 329, 91 S. Ct. 1209; *People v. Davis* (1966), 74 Ill. App. 2d 450, 221 N.E.2d 63.

However, "[w]hen the language of an instruction is inaccurate, and, standing alone, might have misled the jury, others in the series may explain it, remove the error or render it harmless." *People v. Wright* (1974), 24 Ill. App. 3d 536, 541, 321 N.E.2d 52, 56.

Two cases cited by the parties as being significant are *People v. Muir* (1977), 67 Ill. 2d 86, 365 N.E.2d 332, and *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888. In both, our supreme court was faced with the question of whether juries were properly instructed as to the elements of attempted murder. However, defendants urge us to follow the reasoning of *People v. Roberts* (1978), 56 Ill. App. 3d 667, 372 N.E.2d 143, where the court impliedly found that *Trinkle* had *sub silentio* overruled *Muir* and applied *Trinkle* as the controlling precedent. To the contrary, we believe that the instructions given in *Muir* and *Trinkle* are distinguishable and that the rules expressed in each case are harmonious.

In *Trinkle*, the indictment did not specify an intent to kill and, concerning the instructions to the jury, the court said:

"Only [one instruction] exacts the 'intent' to commit the crime of murder. The other two define the offense as performing an act with the knowledge that such 'created a strong possibility of death or great bodily harm.' The first is admittedly correct; it is at logger-heads with the other two." (68 Ill. 2d 198, 200, 369 N.E.2d 888, 890.)

In *Trinkle*, the court pointed out that under the terms of the indictment as

well as the instructions, the jury could have found defendant guilty of attempted murder without any specific intent to kill so long as he shot a gun " 'knowing such act created a strong probability of death or great bodily harm.' " (68 Ill. 2d 198, 201, 369 N.E.2d 888, 890.) In reversing, the court stated that "[t]o obtain a conviction on the charge of attempted murder, the indictment must charge a specific intent to commit the specific offense, and the jury must be accordingly instructed." 68 Ill. 2d 198, 204, 369 N.E.2d 888, 892.

■■ The situation differed in *Muir*, inasmuch as the indictment explicitly defined the mental state in attempted murder as the intent to commit murder, and the question presented for review was whether such an attempt was compromised by the use of the term "great bodily harm." In pertinent part, the indictment provided:

" '[H]e did with intent to commit the offense of Murder * * * point a loaded gun at [name of officer] and pull the trigger knowing such acts created a strong probability of death or great bodily harm * * *.' " (67 Ill. 2d 86, 90, 365 N.E.2d 332, 334.)

Finding no such compromise, the court stated:

"[T]he phrase 'or great bodily harm' is not to be read separate and apart. The entire sentence must be taken together to connote the serious nature of the act, the commission of which, if death results, constitutes the crime of murder. Acts that fall within section 9—1(a)(2) are those the natural tendency of which is to destroy another life. [Citations.] Thus, if an assailant fires a pistol at a person, he knows that his act, if the bullet strikes a vital organ, creates a strong probability of death or, if it does not strike a vital organ, the act at least creates a strong probability of great bodily harm.

* * * [T]hat defendant had the intent to commit murder and that he knew his actions created a strong probability of death clearly indicate that the phrase 'or great bodily harm' is used in connection with the attempted taking of another's life through intentional, dangerous conduct performed with disregard of the probable consequences.
* * *

* * * [W]e have held that it is not error to give an instruction which defines the specific offense in an attempted murder case [citation], provided the felony murder definition of section 9—1(a)(3) is omitted. [Citation.] We adhere to these holdings and find no error in the instant instruction.

* * * The clear import of the statutory language is that one commits murder if he performs acts from which death ensues, knowing that either death or great bodily harm would most

probably result. Where a defendant has the intent to commit murder and knowingly and intentionally creates such a probability the mental state necessary for attempted murder is satisfied." (67 Ill. 2d 86, 93-95, 365 N.E.2d 332, 336.)

The indictment and the instructions in the instant case expressly define the mental state as the intent to murder. They also define the crime of murder in statutory terms, except that the definition of felony murder was properly omitted (see *Viser*); and, in IPI Criminal No. 6.07, set forth above,the jury was told that to sustain the charge of attempt, the State must prove that the defendant performed an act which constituted a substantial step towards the commission of the crime of murder and that the defendant did so with the intent to commit the crime of murder. Therefore, we believe the instructions clearly, consistently and correctly informed the jury of the elements of attempted murder and did require the jury to find the specific intent to kill as a prerequisite to finding defendants guilty of attempted murder. Accordingly, we find the instructions were proper. *Trinkle; Muir; Wright.*

Defendants next contend that they were not proved guilty of attempted murder beyond a reasonable doubt. They have abandoned their trial court argument that they were not the persons involved, and they now assert instead that because McDougle was shot in the leg, when there was an opportunity to fire at his head or chest, is indicative of an intent only to disable so as to facilitate their escape. Thus, they argue that the evidence is so unsatisfactory as to raise a reasonable doubt that defendants harbored the necessary intent to kill. We disagree.

" 'The gist or essence of the crime of assault with intent to murder is a specific intent to take life and such intent must be proved as charged beyond a reasonable doubt. However, since intent is a state of mind, and, if not admitted, can be shown only by surrounding circumstances, it has come to be recognized that an intent to take life may be inferred from the character of the assault, the use of a deadly weapon and other circumstances. [Citations.] It is not requisite or necessary that the party charged should have brooded over the intent, or entertained it for any considerable time, but it is enough if at the instant of the assault he intended to kill the party assaulted, or it will be enough if he is actuated in making the assault by wanton and reckless disregard of human life that denotes malice, and the assault is made under such circumstances that, if death had ensued, the killing would have been murder. [Citations.] As was pointed out in both *People v. Shields*, 6 Ill. 2d 200, and *Weaver v. People*, 132 Ill. 536, since every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act, it follows that if

one wilfully does an act the direct and natural tendency of which is to destroy another's life, the natural and irresistible conclusion, in the absence of qualifying facts, is that the destruction of such other person's life was intended. * * *' " (*People v. Muir* (1977), 67 Ill. 2d 86, 91-92, 365 N.E.2d 332, 335, quoting *People v. Coolidge* (1963), 26 Ill. 2d 533, 536-37, 187 N.E.2d 694, 696-97.)

In their briefs, defendants cite two cases in support of their position (*People v. White* (1972), 7 Ill. App. 3d 1084, 288 N.E.2d 705 and *People v. Thomas* (1970), 127 Ill. App. 2d 444, 262 N.E.2d 495); however, we believe that both are distinguishable. In *White*, the defendant, an army sharpshooter, wounded the complainant in the buttocks and foot and, at trial, testified that he did not intend to kill him. He was found guilty of aggravated battery but not guilty of attempt murder. In affirming defendant's conviction, this court stated:

"The jury could have found that due to the nature of the wounds and the defendant's expertise with a gun that he did not intend to kill Cummings yet intended to commit a battery." (7 Ill. App. 3d 1084, 1089, 288 N.E.2d 705, 708.)

In *Thomas*, defendant entered complainant's apartment brandishing a knife, with which he cut and scraped various parts of her body before robbing and raping her. Based upon the facts and circumstances, the court held that the proof of intent was adequate to establish the necessary mental state for aggravated battery but not for attempted murder. There is nothing in the record, however, to indicate that the cuts were more than superficial, and we find it notable that the descriptive terms used in the opinion did not include "stab," indicating not only an unexercised opportunity to murder but also a type of attack the direct and natural tendency of which was not to destroy life.

■■ Here, after McDougle and his cab had been thoroughly searched for money and weapons, Burdine shot directly at McDougle using a sawed-off shotgun at close range. This discharge inflicted a four- to five-inch wound, blew away muscle tissue, and severed numerous veins and arteries causing profuse bleeding. While we agree with defendants that the use of a shotgun does not *per se* raise an inference that murder rather than a disabling injury was intended (see *People v. Burrage* (1973), 15 Ill. App. 3d 1002, 305 N.E.2d 182 (abstract)), we cannot accept defendants' argument that the shot into McDougle's leg was carefully measured to avoid killing him. There is no evidence, such as in *White*, that Burdine was an expert in the use of guns and, viewing the totality of the circumstances—which included among other things that some other means, such as a blow to the head, would have better facilitated their escape; that the discharge of a sawed-off shotgun at close range could be expected to cause the type of bleeding which would eventually interrupt

the servicing of vital organs; and that the victim was left in the alley with a severe wound and obvious profuse bleeding—we believe it was not unreasonable for the jury to have found an intent to kill.

■■ Defendants next maintain that they were denied a fair trial because of prosecutorial misconduct. They argue that the prosecutor, by stating that he had no objection to certain police reports going to the jury, forced an objection by defense counsel and thereby raised an inference that defendant was attempting to hide probative evidence of guilt. Again, we cannot agree. It is error to offer to stipulate in the jury's presence to the admission of documents otherwise inadmissible, or which might be prejudicial to the opposing party, becuse his counsel is unfairly put in the position of either offering the documents or suffering the adverse inference that he is hiding evidence. (See *People v. Beard* (1966), 67 Ill. App. 2d 83, 214 N.E.2d 577.) However, while an offer to stipulate to the admission of such a document is to be condemned (*People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402; see also, *People v. Richardson* (1977), 48 Ill. App. 3d 307, 362 N.E.2d 1104), such conduct does not constitute reversible error absent resulting prejudice (*People v. Cunningham* (1970), 123 Ill. App. 2d 190, 260 N.E.2d 10).

■■ Here, defendants' counsel first brought the attention of the jury to the existence of the three police reports in his cross-examination of a police officer, during which the following colloquy took place:

"Q. Is there anything that would help refresh your recollection as to what Mr. McDougle told you, for example, your police report?

A. It may.

Q. I give you, officer, what has been marked as Defendant's Exhibit 1 B, police report of yours on November 7th. And I'd ask you to look over the police report.

Mr. Petersen: Judge, we would have no objection if all the police reports in this case would go back to the jury.

Mr. Lagalbo: Judge, counsel knows that is illegal.

The Court: Sustained.

Mr. Petersen: Judge, it is not illegal.

Mr. Lagalbo: Well, it's not admissible.

Mr. Petersen: Counsel knows that. We would have no objection, Judge.

The Court: Ask the next question."

Thereafter, these reports were not referred to by the State during the trial or in final arguments. While we do not condone the prosecutor's improper action, we note that the court sustained the objection to the comment and, in the light of a strong evidence of guilt, we do not believe that the colloquy was prejudicial to the extent that reversal is required.

Burdine separately contends that the trial court committed reversible

error in complying with a request of the jury during its deliberations for photographs which had been used in his identification.

Where exhibits have not been admitted into evidence, it is error to permit the jury to take them to the jury room. (*People v. Holcomb* (1938), 370 Ill. 299, 18 N.E.2d 878.) However, in *People v. Legel* (1974), 24 Ill. App. 3d 554, 559, 321 N.E.2d 164,168-69, the court stated:

> "Courts of review will not reverse for harmless, technical or formal errors where substantial justice has been done. [Citation.] 'The question upon review is not whether the record is perfect but whether the defendant has had a fair trial under the law and whether his conviction is based on evidence establishing his guilt beyond a reasonable doubt. Where the error complained of could not reasonably have affected the result the judgment will be affirmed.' [Citation.]"

■■ During trial, the State had shown a group of photographs to McDougle which he identified as those displayed to him when he made a pretrial identification. The State, however, did not ask that they be received in evidence and, during its deliberations, the jury asked for those photographs. Over the objection of all parties, the court sent them to the jury room. Because this action of the court was erroneous, we must examine the record to determine whether the error could reasonably have affected the result. (*Legel.*) While the mug shots may imply prior criminality, as Burdine contends, such an implication is not warranted here, where the photos of Burdine and two others were not mug shots. Further, they went only to Burdine's identification, which he does not contest. Thus, we believe the error to be harmless beyond a reasonable doubt.

■■ Smalley also maintains that he was denied a fair trial because evidence of prior criminality was erroneously admitted. During the course of his direct examination, a police officer testified that he went to headquarters, where he removed and then showed to McDougle a photograph of Smalley taken from the "Alpha File" and that subsequently he showed McDougle a police photographic album in which Smalley's picture appeared and from which McDougle again identified Smalley. It is argued that this testimony was inadmissible as inferring the commission of other crimes independent of and disconnected from the offense charged. (*People v. Lewis* (1964), 30 Ill. 2d 617, 198 N.E.2d 812.) We note, however, that an exception is recognized where the evidence tends to aid in the identification of the accused as the perpetrator of the offense charged. (*People v. Longstreet* (1974), 23 Ill. App. 3d 874, 320 N.E.2d 529.) Here, any inference as to Smalley's prior criminality from the photographs was tenuous (*People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340; *People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d

364); but, even if such an inference could be drawn by the jury, we find no prejudicial error, as the testimony was probative of his identification.

Smalley next argues that reversible error resulted during closing argument when the professional reputations of the prosecutors were pledged and the status of the State's Attorney's office was invoked to warrant the truthfulness of the State's witnesses and its case-in-chief.

During a closing argument, the prosecutor may discuss the witness's credibility but should not warrant the truthfulness of State's witnesses on the basis of personal or official prestige. (*People v. Martin* (1975), 29 Ill.App. 3d 825, 331 N.E.2d 311.) Neither should he ask the jury to find a fraudulent conspiracy between the State's witnesses and himself as a prerequisite to rendering a not guilty verdict. *United States v. Phillips* (7th Cir. 1975), 527 F.2d 1021.

■■ Here, during closing argument, defense counsel attacked the credibility of two police officers regarding identification procedures because they had not produced certain photographic evidence to corroborate their testimony, and Smalley contends that the prosecutor thereafter committed reversible error in his argument. We have examined the remarks complained of and, while much of it could properly be considered permissible discussion of the witnesses and their credibility (*People v. Oden* (1975), 26 Ill. App. 3d 613, 325 N.E.2d 446), we view some of the comments to be improper—particularly the statement in support of the credibility of the State's witnesses that the prosecutors would not risk their licenses to practice law by being involved in a frame (*Martin*) and the comment that if the jury believed there was a conspiracy between the prosecution and the State's Attorney, they should "[t]hen go back and sign a not guilty verdict." Nevertheless, even assuming that such comments were error, we believe that they were harmless for the following reasons: First, because the prosecutor's remarks related only to Smalley's identification, which he no longer contests, having narrowed his contention to a failure to establish the necessary intent to kill; second, had Smalley not abandoned the identity issue, his in-court identification was positive and, as stated in *People v. Blackman* (1976), 44 Ill. App. 3d 137, 141, 358 N.E.2d 50, 53:

> "[W]hen the evidence adduced is so overwhelming that a conviction would, of necessity, result even if the error were eliminated, a court of review will not reverse the trial court's judgment. [Citations.]"

In view thereof, we cannot find that the prosecutor's remarks denied Smalley a fair trial.

Lastly, Smalley contends that his sentence was excessive. He posits that a sentence of 60 to 100 years is not in keeping with the spirit and rehabilitative purpose of sentencing and that the severity of the sentence

was based in part upon inaccurate information concerning prior offenses. We disagree.

"The purpose of modern-day penology is the rehabilitation of the offender. That sentence which has the greatest potential of restoring the offender to a useful and productive place in society while at the same time adequately punishing the offender for his misconduct and safeguarding the public from further offenses is the one which should be imposed. [Citations.]" (*People v. Harpole* (1968), 97 Ill. App. 2d 28, 33, 239 N.E.2d 471, 474.)

During the hearing in aggravation and mitigation, the trial court may consider the contents of a presentence report (*People v. Cook* (1975), 31 Ill. App. 3d 363, 334 N.E.2d 834) and a police report of prior convictions (*People v. Dennis* (1970), 47 Ill. 2d 120, 265 N.E.2d 385, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2212), as well as the nature and circumstances of the offense (*People v. Parker* (1976), 40 Ill. App. 3d 597, 352 N.E.2d 394; *People v. Collins* (1976), 36 Ill. App. 3d 269, 343 N.E.2d 550). While care is to be taken by the trial court in determining whether the information it considers is accurate, reliable and proper (*People v. Crews* (1967), 38 Ill. 2d 331, 231 N.E.2d 451), inaccuracies in the presentence report may be waived by defendant's failure to object during the hearing in aggravation and mitigation (*Cook*).

■■ Here, the presentence report stated that Smalley had previously been convicted of armed robbery; whereas, the police report of prior convictions on close scrutiny indicated robbery rather than armed robbery convictions. During the hearing in aggravation and mitigation, the Assistant State's Attorney identified the previous offenses as armed robbery without objection. Neither did Smalley point out the conflict while offering matters in mitigation. In view thereof, this inaccuracy was waived. (*Cook.*) Furthermore, a review of the record not only discloses that senseless violence was employed here after the victim had acceded to Smalley's demands; but also that the trial court, before passing sentence, gave consideration to Smalley's potential for rehabilitation. Under the circumstances, we do not believe the sentence was excessive. *Parker; Collins.*

For the foregoing reasons, the judgment is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.