THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RANDY DILLARD, a/k/a Ronald Scott, a/k/a Michael McNair, *et al.*, Defendants-Appellants.

First District (5th Division)   No. 77-1081

Opinion filed January 19, 1979.

James J. Doherty, Public Defender, of Chicago (Andrea D. Lyon, Suzanne M. Xinos, and John Thomas Moran, Assistant Public Defenders, of counsel), for the appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and J. Jonathan Rugenberg, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants were convicted of rape, armed robbery and burglary. (Ill. Rev. Stat. 1975, ch. 38, pars. 11—1, 18—2 and 19—1.) They were sentenced, for the rape and armed robbery to concurrent terms of 40 to 100 years, and for the burglary to concurrent terms of 6 to 20 years. On appeal they contend that: (1) they were not proven guilty beyond a reasonable doubt; (2) the trial court erred in giving the jury an accountability instruction; (3) the trial court erred in admitting a photograph of them into evidence, and (4) certain prosecutorial misconduct denied them their right to a fair trial.

The following pertinent evidence was adduced at trial.

*For the State*

*Theodore Madsen, Chicago Police Officer*

On April 8, 1974, he was in uniform in a marked car, patrolling with his partner, Anthony Baldassano. At approximately 5:45 a.m. they received a radio call directing them to 525 West Hawthorne, which was a big apartment complex approximately four blocks away. Upon arriving at the scene, he let his partner out by the front door, drove east, and parked his car so that it completely blocked the driveway which led from the garage at the side of the building. He then exited his car and saw a vehicle's headlights shining through the garage door. He walked up to the door, and saw two persons wearing dark clothing and bright objects on their heads standing to the rear of the car, which was a white over red Cougar. After a very brief moment, they ran away from him. He went back to his car, drove it so it directly blocked the vehicle in the garage, and then went back to stand by the garage door. He entered the garage some 30 minutes later and saw that the vehicle inside was loaded with clothing and various other items. He moved the vehicle, which had its keys inside, to the east side of the garage, and remained with it until the evidence technician arrived.

On cross-examination he acknowledged that he saw only the backs of the two individuals in the garage.

*Anthony Baldassano, Chicago Police Officer*

After he and Officer Madsen arrived at 525 West Hawthorne, he entered the apartment building through an inner door which was locked but which was opened for him by the doorman. He asked the doorman if anyone had exited the building and he replied "No." He then went up in the elevator to apartment 2001, where he knocked on the door and identified himself as "the police." Carol Brown, who was crying hysterically, opened the door, hugged him and said, "Thank God, you are here." He followed her into the living room and noticed that clothes were thrown all over the floor and other things had been knocked over. He saw Sarah and Allyn Robinson lying on the floor. Allyn Robinson's head and mouth were wrapped with tape, and his and Sarah's hands were bound. A Sergeant Curry arrived, and cut their bindings. He left Sergeant Curry with them and went down the stairway. After he looked around some of the hallways on several different floors to see if anyone was there, he returned to the apartment. He later went down to the garage, which he searched with other police officers. He then returned to the apartment, from which he took Carol Brown, Sarah Robinson and Allyn Robinson to St. Joseph's Hospital.

On cross-examination he admitted that he had met defendant McNair twice before the incident. He recalled that his was the first Chicago police car to arrive at 525 West Hawthorne.

*Richard Curry, Chicago Police Officer*

On April 8, 1974, he and his partner, Officer Siles, were patrolling in a marked vehicle. At approximately 5:45 a.m., pursuant to a radio call, they went to 525 West Hawthorne. While his partner stayed downstairs by the front door he went up to apartment 2001. There he saw Officer Baldassano and Carol Brown, who was crying. He also saw Allyn and Sarah Robinson lying on the floor. Allyn's hands, feet and head were bound with tape, and Sarah's hands and feet were bound with nylon stockings. After he freed them, Sarah Robinson began yelling for her baby. They found the baby on the floor in the dining area, and Sarah Robinson picked it up. Carol Brown told him that during the incident, one of the individuals had mentioned the name "Bobby," and that the shorter of the two men had an accent. Scattered on the floor of the apartment was more tape which looked like the tape that was bound around Allyn Robinson's head. That tape had hair sticking to it.

On cross-examination he acknowledged that the statement in his police report that he was the first officer on the scene was incorrect.

*Tony Gebert*

On April 8, 1974, he was the building engineer at 525 West Hawthorne. The building's garage was then opened electronically by a box into which magnetic cards were inserted and a current which opened the garage door was sent out. The car entering the garage would cause the door to close automatically after approximately 20 seconds. People who have a stall in the garage are issued cards. A person could get into the building through the entrance door and corridor at each of the garage's levels, and could then take the service elevator up to the 20th floor and apartment 2001. At approximately 6 a.m. on April 8, 1974, some police officers called him down to the lobby and then to the bicycle or buggy room in the service area. He used his keys to open the locked door to that room. Only the tenants of the building had keys to that room. He entered the room, turned on the light, and saw what looked like dark slacks lying on the floor behind some bicycles. He left the room and said that he saw someone in the back. While the police officers went into the room, he went down the hall to the front lobby. He later saw the police officers leaving that area with individuals who were wearing dark slacks, but were not wearing ski masks.

On cross-examination he acknowledged that there were four other building engineers under his supervision. He acknowledged that there are a series of doors along the corridor in which the bicycle and buggy room is located. The first door on the east, which is not locked, leads to the compactor room, where there is another door, locked and bolted from the inside, which leads to the outside. There is another door exactly opposite the bicycle and buggy room which leads to the outside. The

service personnel are supposed to double lock it in the evening and open it in the morning. When so locked, it cannot be opened from the inside or the outside. He could not recall whether he personally locked that door on April 7, 1974. There is another door in the service area which leads outside. It is locked from the inside from 8 p.m. to 8 a.m. That was his responsibility, and he recalled that he did check all the doors on April 7, 1974. Other doors in the area lead to the garage and the swimming pool.

On redirect examination he testified that between 8 p.m. on April 7 and 8 a.m. on April 8, 1974, no doors were unlocked. The only way to enter the building at that time was to be let in the front door by the doorman, or put a card in the garage box to open the garage door. Although he could not recall whether he personally locked the door across from the bicycle and buggy room on the night of April 7, 1974, he knew that this door was locked.

On re-cross examination he acknowledged that on April 8, 1974, he did not find that any of the building's exterior doors had been tampered with.

*Carol Brown*

On April 8, 1974, she lived in a one-bedroom apartment at 525 West Hawthorne. She had a plastic card to open the building's garage door. At approximately 2 a.m. her friend Allyn Robinson used her card to open the garage door, drive her red Mercury Cougar into the garage, and park. After they exited the car, as Allyn Robinson approached her, he yelled, "Oh my God." She turned around and saw a tall man, approximately 6'1", who was wearing dark clothing, a gold ski mask, and carrying a gun which looked like a German lugar. Next to him was a shorter man, approximately 5' 8", who was wearing blue jeans and red tennis shoes. The tall man told them to get down, and keep their heads down and eyes closed. The two men then taped their hands behind their backs. The short man wrapped some tape around her head and neck, although he missed a portion of one eye and part of her mouth. Allyn's head was also wrapped with tape. The tall man asked them for money, but she told him she didn't have any. The short man took a gold ring and turquoise pendant she was wearing. He also took her purse. The tall man in the gold ski mask then asked her where she lived. Because Allyn's wife Sarah and their baby Emil were staying in her apartment, she lied and said she lived in 1603. She heard the short man call over the tall man and whisper to him, "Look, she lives in 2001." The tall man then returned, hit her, and, as she fell against the car, said "Okay, bitch, let's try it again." She admitted that she lived in 2001. The man asked Allyn who was up there, and Allyn said that his wife and baby were in the apartment. After a few minutes, she heard the trunk of the car being opened and the tires she had in there being taken out. The men put her in the trunk of the car, bound her feet, and

taped them to her hands. They placed Allyn in the trunk on top of her. The tall man told her that if nobody was in her apartment he would kill her, and that if they talked he would shoot them through the trunk. After approximately 20 minutes the trunk opened, they were taken out, and the bindings on their feet were cut. Her feet were "asleep" and she couldn't walk. The tall man said to her "What's the matter with you, bitch, can't you walk?" When she told him that she had just gotten out of the hospital and was very weak, he said, "If you don't walk straight I'm going to kill you." They took them up in the freight elevator to her apartment. The short man tied a pillow case tightly around her neck, bound her feet again, took her into the living room where Sarah and Allyn and the tall man were, and pushed her down on the floor. They asked her for money, and she said she didn't have any. They took her into the bedroom, freed her hands and feet and took the pillowcase off her head. They asked again for money and she told them that neither she nor the Robinsons had any. The tall man said, "Your little girlfriend is beginning to look pretty good to me." When she said that she would do anything to protect her friend but that she didn't have any money, he said "If you don't give me your money, I'm going to kill you, bitch, I have killed before." She said that she had a color T.V. and maybe some jewelry, but didn't have any money. The short man then bound her hands behind her back and took her to the bathroom. He told her to sit on the toilet, which she did. He started removing the tape from her hands and head, and in doing so yanked out some of her hair. It was very painful, and she fell over. He tied her hair on her head and pulled off her sweater, bra and pants. He pushed her on the floor, but when she hit her head on the bathrub he yanked her back and said, "Can't you lie down?" She said she could not because her neck was bandaged after some surgery. He placed something under her head and said "If you don't make it good I'm going to kill you, bitch." He then got on top of her and performed an act of sexual intercourse without her consent. She heard him say "What's the matter with you, are you dead?" and then she blacked out. When she woke up, the tall man and short man were talking together. They talked in the bathroom, and then went into her bedroom, from where she could hear drawers opening and closing. After about 20 minutes she heard the front door open and close and when she didn't hear anything else, she thought the two men had gone. She started to get up, but the short man appeared, said "Where do you think you are going, bitch?" and yanked her into the hall. He told her to lie down, and said "Here is something for you," and "Try to make it good this time." He then began to perform another act of sexual intercourse upon her without her consent. During the act, the front door opened and he stopped. He called out a name that sounded like "Ruby" or "Roddy" and asked, "Is that you?" After he received no answer, he called out again

and said, "It's me, it's me, it's Bobby." She heard the tall man yell, "Shut up." The short man completed the act of sexual intercourse, and then went to the tall man and asked him what time it was. The tall man said it was five after five. She heard them gathering things in a suitcase, after which the short man came back and tied her hands and legs with nylons. The tall man said, "We are going to load the car. I'll come back and get this bitch and kill that bitch." The two men left the apartment.

She listened until she was sure they were gone, then managed to free herself and run into the bedroom. She plugged in the phone and called the police. She was hysterical, and because she was afraid they wouldn't come if she said it was a rape, she said that a burglary was in progress, and gave her name and address. A few minutes later she heard a knock on the door, and a man's voice said, "This is the police." After he showed her his badge through the peephole, she opened the door, grabbed him, and said, "Thank God, you are here, and they are still here in the building." Other police officers arrived, including a Sergeant Curry, who untied or cut loose the bindings on Allyn and Sarah Robinson. She was later taken to St. Joseph's Hospital, where she told the doctor that she had been raped twice. After taking some vaginal smears, he gave her something in case she was pregnant, and also gave her some shots. She identified two gold rings, a lighter and a key ring as items that were taken from her on the night of the incident. She also identified as taken from her two keys, one of which opened her apartment and the other of which opened the front door, the bicycle room door, and the other doors in the building. She also identified a photograph of her color television, which was taken from her without her permission on the night of the incident.

On cross-examination, she admitted that she could not see which of the men took the keys from her purse, opened the trunk, or opened the door to her apartment. She acknowledged that she gave a glass to one of the policemen examining her apartment. She did this because she had asked the short man, who was not wearing gloves, to give her a drink of water. He gave her some in a glass, which she left in the corner of the bathroom. She acknowledged that no police officer asked her about the glass. She recalled that she did not see the glass when the short man gave it to her because she was blindfolded, and stated that while the glass she gave the policeman might have been another one, the one in his hand seemed like the one she used. She acknowledged that a number of other objects including coats which were later returned to her were also taken from her apartment. She did not know if a Timex watch was taken from her apartment but if it was, it was not hers.

*Robert Pasternak, Chicago Police Officer*

On April 8, 1974, pursuant to a radio transmission, he and his partner, Kenneth Keeley, went to 525 West Hawthorne at approximately 6 a.m. He

and Keeley entered the building and talked to a Sergeant Vaughan in a T-shaped hallway next to the lobby. They saw an Officer Cyrek and the building's janitor, Tony Gebert, in the hallway. Gebert left and returned a few minutes later with some keys, Gebert opened the locked door to the bicycle and buggy room, turned on the light and went inside. He quickly came running out of the room and yelled that "They were in there." Officers Pasternak and Keeley then ran into the room. They saw, getting up from the floor, a tall man wearing a gold ski mask and a small man wearing a red ski mask and red gym shoes. These men were, respectively, defendant Randy Dillard and defendant Bobby Lewis. Both wore dark clothing. They were arrested, searched and transported to the 19th District Police Station.

On cross-examination he stated that prior to entering the building, he did not see any individuals sitting on the back seat of a Chicago police car in the building's driveway. He acknowledged that he saw Officer Madsen when he arrived at the scene, but stated that he did not talk to him.

*Eugene F. Cyrek, Chicago Police Officer*

In the early morning hours of April 8, 1974, pursuant to a radio call, he and his partner John Raetzman went to 525 West Hawthorne. He substantially corroborated Officer Pasternak's description of the entry into the bicycle and buggy room. After Tony Gebert unlocked the door, entered and rushed back out of the room, the other police officers ran into the room where one tall man and one short man, who he later learned were the defendants in this case, were lying on their stomachs. They were wearing respectively, gold and red ski masks. After they were arrested and led from the room, he searched the area. Next to where defendant Dillard had been lying he found a rolled up towel. He unrolled it and found an automatic pistol, similar to a German lugar, which he unloaded. He found another rolled up towel in a basket on a bicycle, directly above the spot where defendant had been lying. Inside the towel he found several pieces of jewelry, keys and other items. He had never seen these items prior to recovering them at that time by the buggy room.

On cross-examination he acknowledged that upon arriving at the scene he saw one other police car in the driveway, but he did not see anybody in the back seat of the car and he did not go over to it. He stated that he did not preserve the gun he recovered for fingerprints because he had handled it repeatedly. He acknowledged that although he inventoried the items he recovered and turned them over to a Chicago police detective, he did not make any request for their examination by the Chicago crime lab. He did not recall if defendants were fingerprinted.

*George Mikel, Chicago Police Department Evidence Technician*

On April 8, 1974, he spent approximately two hours looking for evidence at apartment 2001 at 525 West Hawthorne. A majority of that

time was spent looking for fingerprint impressions, which he tried to find by brushing surfaces in the apartment with special powders. He brushed 10 to 15 objects and got approximately 20 to 30 impressions. Some of these were smudged, or "superimposed" one print on another, and were therefore unclear. He did get some suitable prints from a glass on the floor in the bathroom and another one on the nightstand in the bedroom.

On cross-examination he described each surface which he processed for fingerprints, including dresser drawers and jewelry boxes in the bedroom, but he stated that he did not process any automobile in the garage.

*Sergeant Hugh Granahan, Police Officer with the Chicago Police Crime Laboratory's Fingerprint Identification Section*

All parties stipulated that if Sergeant Granahan, who is a fingerprint comparison expert, were called, he would testify that he examined two glasses and a silver pitcher submitted to him by evidence technicians Mikel and Shannon. He raised some suitable impressions from these objects, and compared them with the fingerprints of Carol Brown, Sarah and Allyn Robinson, and both defendants. The only fingerprints he found, on all three objects, were those of Carol Brown. He also found two "ridge impressions" on one of the glasses which were compared, but could not be identified.

*Sergeant Vitullo, Police Officer with the Chicago Police Crime Laboratory's Microanalysis Section*

All parties stipulated that if Sergeant Vitullo who is an expert at scientific evidence examination were called he would testify that he examined vaginal smears that were taken from Carol Brown and Sarah Robinson on April 9, 1974, at St. Joseph's Hospital. He found that both were positive for the presence of spermatozoa. He also examined the clothing of defendants, taken from them some time after their arrest, and found it negative for the presence of spermatozoa.

*Sarah Robinson*

On April 8, 1974, she and her six-month-old son were staying in Carol Brown's apartment at 525 West Hawthorne. Her husband was at work in Chicago, and Carol Brown had gone with him. At approximately 2 a.m. she was talking to a girl friend on the telephone when she heard the apartment door being opened. She thought it was Carol and her husband, but she then saw two men approaching her. One of them was taller and wore a butterscotch ski mask and dark clothing. The other was shorter, and wore a red ski mask and red tennis shoes. The taller man put a handgun to her head, pressed the button on the telephone, and told her that he had already killed somebody else that night so she had better not try anything. The phone rang, and she told him that it was the girl she had been talking to calling her back. He told her to make a good excuse or he

would kill her. She told her friend that Carol and her husband needed some help downstairs, and she hung up the phone. The tall one said that he was going to "go downstairs and get them" and he left. The shorter one demanded that she go into the bedroom. After he took his trousers off and made her take off her clothes, he had intercourse with her against her will and without her consent. Her hands and legs were then bound with nylon hose, a pillow case was put over her head and she was taken into the living room. She was made to lie on the floor next to her husband, whose voice she recognized when he spoke to her. She also heard sounds which indicated that the men were packing up things in the apartment. After some 20 or 30 minutes the taller man came in, took her back into the bedroom, cut her bindings, and had sexual intercourse with her without her consent. He then tied her up again as she had been tied before. After they left, Carol Brown came in the bedroom and cut her loose, and she ran to her husband. While the two men were in the apartment she heard them talking back and forth and heard them use the names "Randy" and "Bobby."

On cross-examination she acknowledged that when the police came approximately one minute after she had gone to her husband, she was not yet completely untied. She admitted that she did not tell the police or anyone else that she heard the names "Randy" or "Bobby" until she told that to her attorneys as she was going over some details with them on the night before she was called to testify. She denied the suggestion that her attorney told her the names of the two defendants, and stated that prior to talking to them she had not remembered the names because she had blocked a lot of things out. She recalled that when he first entered the apartment the tall man wore gloves, but removed them prior to having sexual intercourse with her.

*Allyn Robinson*

He is married to Sarah Robinson and they have a son who, on April 8, 1974, was six months old. On that date, at approximately 2 a.m. he left the London House, where he was working as a musician, and drove with Carol Brown to her apartment. She had come to see the show in which he was working, and he and his family were staying in her apartment. He drove the car into the building's garage, which he opened by inserting the special card into a slot. He and Carol were then approached by two men, one of whom was taller, wore a gold ski mask, and carried a gun. The shorter man wore a red ski mask and red tennis shoes. He substantially corroborated Carol Brown's testimony of how their hands and heads were bound and taped, how the men asked for money, placed them in the trunk of Carol Brown's car, and later removed them to her apartment. He remained on the living room floor, bound and taped, for approximately three hours, until his wife and the police came and untied him.

*For the defense*
   *Ronald Vails*
   He is an attorney and lives in St. Louis, Missouri. In April, 1974, he lived at 606 West Cornelia in Chicago, apartment 386, with defendant Michael McNair and Sharon McNair. Early in the morning of April 8, 1974, he returned to his apartment and found that Sharon McNair was there with eight or nine other people. Fifteen or twenty minutes later, defendants McNair and Lewis arrived. He and McNair were good friends, but he had never known him as Randy Dillard. He had met Lewis on two previous occasions and also knew him as Rashad. He stayed in the apartment until 3 a.m., when he called an upstairs neighbor, Carla Lawrence, told her there was a party going on in his apartment and arranged to spend the rest of the night upstairs with her. He did not see either defendant leave the apartment before he left at 3 a.m. He could not recall McNair's clothing at the party, but did remember that he wore a blue turban. Sometime in the afternoon of April 8, 1974, he received a phone call from Sharon McNair, who told him that Michael McNair had been "locked up" right after the party and that he was at the 19th District Police Station. He called that he was at the 19th District Police Station. He called that station and had a conversation with a male voice. He had not seen Michael or Sharon McNair or Bobby Lewis since April 8, 1974.
   On cross-examination he admitted that he saw marijuana being smoked at the party in his apartment. He admitted that he was in the room with the marijuana smoke for three hours and recognized the smell, but denied that it had any effect on his senses.
   *David Taylor*
   He lives at 8221 Laurel in Evanston, and attends Evanston Township High School. On April 7, 1974, he lived at 710 Seward also in Evanston. He left that address sometime after 11 p.m. to go to a party that Sharon McNair had invited him to. He arrived at the party, which was held in a third-floor apartment of a building in the 600 block of Cornelia, between 11:45 and 12. At the party, he met defendants McNair and Lewis for the first time. He drank three glasses of wine and smoked some marijuana. At approximately 3:30 a.m. he, Mark Lane, and defendants McNair and Lewis left the party and went down in the elevator together. As they left the building he saw a police car containing uniformed police officers, who beckoned to McNair to come over. McNair and Lewis both went over, had a conversation with the police officers, and then got into the car. He asked the police officers what was happening, and they told him that everything was alright. He went down the block to get his car and Mark Lane went back into the building. He returned with his car, Mark came out of the building, and he drove him home. He hasn't seen McNair or Lewis since that date. He did not see McNair or Lewis leave the party before 3:30.

On cross-examination he acknowledged that McNair and Lewis did not leave the party with him, but said they must have left just before because they were at the elevator when he and Mark Lane got there. He acknowledged that he may have told a state's attorney's investigator that he did not recall seeing defendants get into the police car. He denied hearing anyone at the party call defendant McNair "Ruby", "Black Ruby" or "Randy."

*Shirley Brown*

On April 7, 1974, she lived with her son at 1435 E. 67th Street in Chicago and worked for the Aetna Insurance Company. At 11:10 p.m. she and a friend named Orlando Wade arrived at a party at Michael and Sharon McNair's apartment on Cornelia and Pine Grove. She described her relationship with the McNairs as one of "associates" and specifically termed her relationship with Michael McNair as "hostile." She saw defendants McNair and Lewis come to the party and she met Mark Lane and David Taylor while she was there. At approximately 3:30 a.m. defendant McNair told her that he was getting ready to go somewhere and would be back in a little while. She then saw him leave with defendant Lewis. Subsequently, she saw Mark Lane talking to Sharon McNair, and then saw Sharon McNair with "a look on her face." She and Orlando Wade left the party some twenty minutes later and she did not see defendants McNair and Lewis or any Chicago police cars when she left the front of the building.

On cross-examination she acknowledged that while she was at the party she drank two beers and, although other people there were smoking marijuana, she did not. She recalled that McNair and Lewis were both wearing dark clothing.

*Mark Lane*

He testified by an evidence deposition taken at Columbus Hospital the day before he was scheduled for intestinal surgery, under advice from his doctor that he could not come to court. He substantially corroborated David Taylor's account of the party at the McNairs' apartment on April 8, 1974, and of McNair and Lewis' entry into a police car at approximately 3:30 a.m. He went back up to the apartment, told Sharon McNair what had happened, went back downstairs, and accepted a ride home from David Taylor. McNair, Lewis and the police car were no longer there. McNair had been wearing a dark suit, and Lewis wore a leisure suit made of denim. He had not heard either man referred to by other names. He has not seen them since that night.

On cross-examination he admitted that prior to giving his testimony he had taken, during the course of the day, six sulfa antibiotic pills. He conceded that Sharon McNair is his cousin, and that she told him that she

was married to Michael McNair. He stated that although he saw and smelled marijuana at the party, he did not smoke any. He described McNair as 6'1" or 6'2", and Lewis as 5'11". He acknowledged that McNair was occasionally referred to as "Rudy."

*William Heatherly*

He is an investigator for the Public Defender's Office. On March 5, 1976, at approximately noontime he went to 525 West Hawthorne. He went to the bicycle and buggy room, found a door directly opposite it and, when he turned the knob, opened that door and found that it led to the outside. On March 9, 1976, at approximately noontime, he again went to 525 West Hawthorne, accompanied by Thomas McCurry, chief investigator for the Public Defender's Office. He again turned the knob on the door directly opposite the bicycle and buggy room, but the door did not open.

*Sharon McNair*

On April 7, 1974, she lived at 606 West Cornelia, apartment 386, with her husband, defendant Michael McNair, and an attorney friend named Ron Bobbs (*sic*). At approximately 10 p.m. she was in her apartment preparing to have a party to which she invited approximately a dozen people. Her husband arrived between 12:15 and 12:30 a.m. accompanied by defendant Bobby Lewis whom she knew as "Rashid." She has also called her husband "Ruby," although she never heard him use the name "Randy" and never heard him called "Ronnie." Her husband and Lewis wore blue denim outfits with dark sweaters. They left between 3 and 3:30 a.m. with David Taylor and Mark Lane. Lane returned alone to the apartment and said that something had happened in front of the building involving her husband, Lewis, and the police. After looking out the window and not seeing anything, she called the 19th District Police Station and asked them if they had her husband. They said no and she hung up. She next saw her husband on April 9, when her attorney told her that charges were placed against him.

On cross-examination she could not recall what color shoes her husband wore at the party, but she did recall that Bobby Lewis was not wearing red or orange shoes. She acknowledged that her husband is 6'1" and is taller than Lewis.

*Defendant Bobby Lewis on his own behalf*

On April 7, 1974, he lived at 3722½ Pine Grove with Rick Goldstone. At approximately 10 p.m. on that date he, defendant McNair and a woman named Carla Lawrence went downtown to the Roosevelt Theater and saw a movie entitled "Three Tough Guys." They left the theater around 11:30 p.m. and took a cab to 606 West Cornelia. After they walked Carla Lawrence to her apartment on the fourth floor of that building, he and McNair went to a party being held in McNair's apartment on the

third floor. He wore a blue jean outfit with black platform shoes, and McNair wore a denim suit. At the party he ate some cheese dip and crackers but did not drink or smoke marijuana. He, McNair, David Taylor and Mark Lane left the party around 3:30 a.m. and went out of the building. As they stood outside talking a squad car pulled up and two police officers, whom he knew and recognized as Officers Baldassano and Madsen, pointed to him and McNair. McNair said, "I think I know what they want," and walked over with him to the squad car. Baldassano opened the door and said "get in." He and McNair got into the back seat and they drove off. They obeyed Baldassano's directions to remove turbans they were wearing and to give him their hands. Baldassano handcuffed his right arm to McNair's left arm. Then they just drove around the neighborhood, cruising down streets and going up and down the Drive. Baldassano repeatedly questioned McNair about marijuana. About an hour after they had first entered the car, the car stopped briefly at a restaurant at Clark and Belmont, and Baldassano ran in and came back with some coffee. They continued to just drive around, stopping once next to another squad car, and stopping later by the Lake somewhere in Lincoln Park, about 3600 North. They stayed there for a while, and Baldassano asked McNair if he thought he could swim with handcuffs on. Baldassano also took McNair's watch. They left Lincoln Park and continued to drive around, on Irving Park, Belmont and Lake Shore Drive. The police continually "hassled" them and asked them a lot of questions. They next stopped at the 19th District station where they got some gas. He and McNair obeyed Baldassano's direction to lie down on the floor of the car. They left the station and were driving around again when he heard some static on the radio and also heard the word "burglary." Then they drove four or five blocks and parked in front of a high rise which he now knows to be 525 Hawthorne. Madsen moved the car, parked in front of the driveway, and also exited the car. A few minutes later Madsen returned, opened the door and told them to get out. They got out and went through a side door which Baldassano was holding open. The police took their handcuffs off and, referring to the bicycle and buggy room, Baldassano said, "get in there and lay down." The door to that room was being held open by a bicycle. They entered the room, lay down, and put their hands on their heads. The police put two towels into the room. As Baldassano was picking things up off of the floor to put in the second towel, McNair's watch fell out of Baldassano's pocket and broke. Baldassano put the watch in the towel, left the towels in the room and shut the door. A couple of minutes later, McNair said, "Shit! I'm going to get my watch" and asked him to look out the window while he did so. He looked out the window and saw a lot of police officers running back and forth. Some 20 to 30 minutes later the door to the room opened and the

light went on. A number of uniformed Chicago police officers then entered. He and McNair were later locked up at the 19th District station. They were still wearing the blue jean outfits they had worn to the party. After he had been at the station for about an hour, two plain clothes police officers came into his cell and demanded that he take his clothes off. He did so, and put on a paper suit the officers gave him. After approximately half an hour, the officers came back, threw in some clothes that he had never seen before and said, "Put these on. Somebody wants to see you." He said "Those aren't my clothes. I'm not going to put them on." When he continued to refuse, one of the officers sprayed mace in his face and both officers rushed him, threw him down and twisted his arm. He then put on the clothes, and the police handcuffed his hands behind his back. He and McNair were taken down to the end of the cells, a red ski mask was put over his face, and a photograph was taken. Among the clothes which he had not seen or worn until he was at the station were a pair of red gym shoes. Although he normally wears a size 8½ or 9, these were a size 10. On April 8, 1974, he was never in the parking area or on the 20th floor of 525 West Hawthorne. He never robbed Sarah or Allyn Robinson, he never raped Sarah Robinson or Carol Brown, he never possessed a weapon and he never saw defendant McNair with a weapon. McNair was in his sight during the entire time in question and he never saw him on the 20th floor or in the company of Carol Brown or Sarah or Allyn Robinson. He identified a watch with a gold band and black face as McNair's watch, which he had previously referred to. He has previously been convicted of robbery, forgery, and possession of heroin.

On cross-examination, he denied having an accent. He acknowledged that he is 5′8″. He acknowledged that he and McNair were not searched for weapons before they got into the police car. He acknowledged that he and McNair could not fully lie down in the car as Officer Baldassano instructed, but that they did kneel on their knees. He acknowledged that he has heard McNair called "Black Ruby," but denied ever hearing him called "Randy" other than in the courtroom incident to this case. He acknowledged that the police did not ask him to put his hands on a gun or to make a confession.

OPINION

Defendants first contend that they were not proven guilty beyond a reasonable doubt. They point out that their fingerprints were not found on objects recovered from Carol Brown's apartment, that they were not identified by her or by Sarah or Allyn Robinson as the assailants, and that the descriptions of the assailants given at trial differed from those aired over the police radio at the time of the incident. Defendants argue that these facts and their "reasonable" and "plausible" explanation for their

arrest at the scene, as described, create a reasonable doubt as to their guilt. We disagree. We note that it was not clearly established that the objects recovered for fingerprint testing were touched by the assailants. No fingerprints of Sarah or Allyn Robinson were found, even though they were staying in Carol Brown's apartment. Moreover, the fingerprint tests conducted found a number of fingerprint impressions to be "smudged" or "superimposed" and therefore unrecognizable. Under these facts, the failure to recover defendants' fingerprints from Carol Brown's apartment in no way raises a reasonable doubt as to their guilt. Further, we have listened to the tape recording of the police radio broadcasts which defendants commend to our attention, and we reject their argument that the descriptions of the assailants aired on those broadcasts are "diametrically different" from the descriptions of defendants at trial. Indeed, those two descriptions are wholly consistent in their mention of two male Negroes wearing blue jeans, one of whom wore red sneakers. Defendants correctly point out that one of the assailants was described over the police radio as 5'10", which is not the height of either defendant Dillard (6'1") or defendant Lewis (5'8"), and that one of the ski masks was described as black instead of red or gold, which the masks were shown to be at trial. These variations reflect, at most, minor errors of judgment in description. When due consideration is given to the fact that the radio descriptions following the incident were passed through several police officers and were apparently given originally from a hysterical Carol Brown, the similarity of those descriptions to the ones at trial only supports the jury's determination of guilt.

■■ It is true, as defendants point out, that the jury did not have the benefit of a direct identification of defendants by the crime victims. This is necessarily true because, by all accounts, the assailants wore ski masks throughout the incident. It is clear, however, that a conviction can be sustained upon circumstantial evidence as well as upon direct. (*People v. Hansen* (1955), 5 Ill. 2d 535, 126 N.E.2d 243.) The requirement that the defendant's guilt be proven beyond a reasonable doubt does not mean that the jury must disregard the inferences which flow normally from the evidence before it. (*People v. Russell* (1959), 17 Ill. 2d 328, 161 N.E.2d 309.) It was shown at trial that defendants match the physical descriptions of the assailants, and that they were arrested minutes after they left Carol Brown's apartment, still in the building, in apparent possession of the items stolen from the apartment and the weapon used. Further, Carol Brown and Sarah Robinson both heard defendants refer to each other by name—"Ruby" or "Randy" for defendant Dillard, and "Bobby" for defendant Lewis.

■■ Against the evidence of defendants' guilt is an elaborate theory of police harassment beginning some 2½ hours before the incident in

question was reported, and of a police "frame" of defendants in place of the real offenders. We note that although defendants' entry into the bicycle room where they were found is easily explained if defendants were the offenders and had stolen Carol Brown's keys, it is only explained under their theory by defendant Lewis' testimony that the door to that room was being held open by a bicycle. The building engineer contradicted this by stating that the door was locked. More importantly, however, we follow the well-established principle that it is up to the jury to resolve all questions of fact and determine the credibility of the witnesses. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) We will not set aside the jury's determination of guilt unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to cause a reasonable doubt of guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) We have reviewed the lengthy record in this case and analyzed the jury's verdict in light of all the evidence adduced. We conclude that the jury had ample grounds to reject as incredible defendants' explanation of the incident, and to find defendants guilty beyond a reasonable doubt.

■■ Defendants next contend that the trial court erred in giving an accountability instruction. "Accountability" of one person for the criminal conduct of another occurs when "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).) Defendants argue that because the evidence established either their total innocence or their joint guilt as principals, an accountability instruction was not warranted. Although defendants cite *People v. McCauley* (1972), 2 Ill. App. 3d 734, 277 N.E.2d 541, as support for their position, we find their reliance on it to be misplaced. Error was found to have occurred in *McCauley* when the jury was instructed on two substantive offenses with which defendant was not charged. The situation in the instant case, however, was dispositively dealt with in *People v. Dukett* (1974), 56 Ill. 2d 432, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226. Our supreme court there held that prejudicial error did not result from the giving of an accountability instruction to the jury because "there was sufficient evidence from which the jury could find both defendants guilty as principals." (56 Ill. 2d 432, 451, 308 N.E.2d 590, 600.) This is exactly the situation in our case. Accordingly, defendants' claim of prejudicial error regarding the accountability instruction is rejected.

■■■ Defendants also contend that the trial court erred in admitting into evidence a photograph, taken at the 19th District Police Station, showing both defendants wearing clothing and ski masks similar to those

described by the victims of the incident in question. Although defendants state that the photograph had no probative value, they concede that it did "provide a visual link for the jury between the description of the crime and the arrest of defendants." Defendants argue, however, that the photograph could have been as easily explained by their theory of the case as by the State's and that it was the only direct link between them and the described offenders. They therefore conclude that any probative value the photograph had was outweighed by its prejudicial effect, and that it should not have been admitted into evidence. We note that in *People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665, cited as supportive by defendants, our supreme court stated that "where evidence is relevant and otherwise admissible, it is not to be excluded because it may also have a tendency to prejudice the accused." (28 Ill. 2d 355, 360, 192 N.E.2d 370, 373.) More specifically, the admission of photographs has always been held to be a matter within the trial court's discretion and, absent a manifest abuse of that discretion, should not be grounds for reversal. (*People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259.) Photographs can be admitted for a number of purposes, including to show the reasonableness of a witness' identification that the offender and the person depicted are the same. (See *People v. Byrd* (1976), 43 Ill. App. 3d 735, 357 N.E.2d 174.) Defendants may be correct that the photograph could have been interpreted as consistent with their theory of a police "frame" as well as with the State's theory of the quick arrest and visual depiction of the offenders. Both theories having been well presented to the jury, it was properly in their province to choose either interpretation. We cannot say that in allowing the jury to do so the trial court manifestly abused its discretion to the prejudice of defendants.

Defendants' remaining contention is that certain instances of misconduct by the State's Attorney unfairly prejudiced them and denied them their right to a fair trial. Defendants first argue that in his rebuttal argument the prosecutor improperly shifted the burden of proof to defendants by commenting on their failure to call certain witnesses and, in general, prove their innocence. Defendants correctly point out that it is wholly improper to make comments which shift the burden of proof to defendants, who are presumed innocent and bear no burden of proof. (See *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) We note, however, that when defense counsel invites or provokes a response by the prosecutor he cannot complain that he has been prejudiced by the response. (*People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026.) Where, as in this case, defense counsel attacks the State's Attorney for his failure to call certain witnesses, it is proper for the State's Attorney to respond and to ask why defense counsel did not bring in the same

witnesses, so long as the response is properly limited to a reply. (*People v. Wheeler* (1955), 5 Ill. 2d 474, 126 N.E.2d 228.) Defendants in their reply brief concede the validity of this rule, but argue that the prosecutor's comments on rebuttal argument "went way out of bounds" so that they no longer constituted a proper reply, but instead tended to shift the burden of proof.

A review of the State's Attorney's rebuttal argument at trial, particularly those portions of it cited and quoted extensively by defendants in their appellate brief, indicates that defendants' argument is generally incorrect. Defendants' counsel, in their closing argument, repeatedly questioned why certain witnesses were not brought to testify by the State and used those questions to attack the truth of the State's case. A review of the State's Attorney's comments objected to by defendants reveals that in almost every instance those comments or arguments were merely proper replies, along the lines indicated above, to defendants' arguments. Where the State's Attorney's comments did tend, as defendants put it, to go "out of bounds" by implying that defendants had to call any witnesses or prove or argue their innocence, the record reveals that the trial court not only sustained defense objections but also took steps to insure that the jury was not improperly influenced. We note one instance in which the trial court stated to the jury that "the defendants are not required to produce any witnesses." Contrary to defendants' arguments that the State's Attorney ignored the court's rulings, we note that in that instance the State's Attorney agreed with the court's statement and explained that he was only commenting in reply to defendants' arguments. We therefore conclude that no prejudicial error resulted to defendants, because the State's Attorney's arguments were made as invited replies and any error which may have occurred was cured and rendered harmless by the trial court's sustaining of defendants' objections and instructions to the jury. See *People v. Rodriguez* (1978), 58 Ill. App. 3d 562, 374 N.E.2d 904.

Defendants further attack the State's Attorney's argument as containing various improper comments on the evidence, on defendants' right not to testify, on the argument of defendants' counsel, and on his own opinions and the weight of the evidence. The record reveals, however, that although a number of comments are now cited by defendants, at trial they made only one objection, which was sustained. For all of the other comments cited, defendants failed to make any objection or motion to strike, or other motions to instruct the jury. Any allegations of error in those comments are therefore waived. (*Village of Park Forest v. Walker* (1976), 64 Ill. 2d 286, 356 N.E.2d 42; *People v. Utinans* (1977), 55 Ill. App. 3d 306, 370 N.E.2d 1080.) Moreover, regarding any claims of "plain error" our review reveals that the cited

comments, both individually and cumulatively, do not appear to have influenced the jury in a manner that might have resulted in substantial prejudice to defendants. We therefore reject defendants' argument that because of the cited comments, reversal of their convictions is warranted. See *People v. Taylor* (1977), 53 Ill. App. 3d 810, 368 N.E.2d 950.

■■ Defendants have also raised several allegations of improper questions asked on cross-examination by the State's Attorney. The applicable standard for review of such questions is that the trial court's rulings should not be interfered with unless there is a clear abuse of the court's discretion resulting in prejudice to defendants. (See *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.) Our review reveals that the cross-examination was actively and adequately controlled by the trial court, and that its sound discretion was not abused.

■■ The only remaining instance of alleged prosecutorial misconduct occurred first during defense counsel's cross-examination of Sergeant Richard Curry, one of the police officers who arrived at the scene of the incident. The following exchange occurred:

"DEFENSE COUNSEL: Now, I would like to call your attention, Sergeant Curry, to page 1 of this [police] report—

STATE'S ATTORNEY: Judge, at the same time, if the jury sees the entire report, no objection, pass it around if you like.

DEFENSE COUNSEL: That is okay, I'll handle my exhibits.

THE COURT: That is improper.

DEFENSE COUNSEL: Objection."

A similar exchange occurred later in the trial during the cross-examination of Police Officer Robert Pasternak, when, referring to his police report, the State's Attorney stated: "We have no objection to the whole report going in." The trial court immediately said, "Now, that statement is improper," and sustained an objection. Defendants argue, correctly, that it was improper for the State's Attorney to offer to submit the police reports to the jury for inspection, and thereby force defense counsel to object, allow their admissions, or appear to be hiding something from the jury. (*People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402.) However, in dealing with this same error, we have stated that "while an offer to stipulate to the admission of such a document [police report] is to be condemned [citations], such conduct does not constitute reversible error absent resulting prejudice." (*People v. Burdine* (1978), 57 Ill. App. 3d 677, 685, 373 N.E.2d 694, 701.) The record reveals that the exchanges cited were isolated incidents, and that the police reports were not referred to again either at trial or during closing argument. That fact, the court's action in sustaining objections to the erroneous conduct, and the ample evidence supporting the jury's verdict lead us to conclude that the

exchanges concerning the police reports were not so prejudicial that reversal is required.

Based on the foregoing, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.